**MCI COMMUNICATIONS CORPO-RATION et al., Plaintiffs,**

v.

**AMERICAN TELEPHONE AND TELE-GRAPH COMPANY and the Bell Telephone Company of Pennsylvania, Defendants.**

Civ. A. No. 73-2499.

United States District Court, E. D. Pennsylvania.

Dec. 31, 1973.

As Amended Jan. 7, 1974.

**1008**

Lewis A. Rivlin, Peabody, Rivlin & Lambert, Washington, D. C., Raymond W. Midgett, Jr., Dechert, Price & Rhoads, Philadelphia, Pa., for plaintiffs.

Irving R. Segal, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., Charles Ryan, J. Hugh Roff, Jr., New York City, Donald F. Clarke, Philadelphia, Pa., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWCOMER, District Judge.

*The Parties*

1. Plaintiffs are MCI Communications Corporation, MCI Telecommunications Corporation, MCI–New York West, Inc., Interdata Communications, Inc., and Microwave Communications, Inc.

2. Plaintiffs are communications common carriers specializing in the interstate transmission of voice and data by microwave. Plaintiffs offer their services primarily to businesses and government agencies whose intra-organizational volume of communication warrants full-time private circuits between their branches which are located in different states as well as with their out-of-state customers. MCI competes in the offering of these services, called "private line services," with other interstate common carriers, including AT&T's Long Lines Department.

3. MCI Communications Corporation, the parent of the other plaintiffs, does not itself provide any transmitting services.

4. MCI has 13,000 stockholders.

5. Some of the services MCI proposes to offer are directly competitive to AT&T interstate offerings, while others may be interstate services not offered by AT&T.

6. MCI also competes, in a sense, with corporations which create their own private microwave communications system.

7. The specialized common carriers like MCI serve with special communications services the corporations which do not have sufficiently great communications needs to warrant building their own private microwave systems.

8. The MCI network has now been extended to include St. Louis, Chicago, South Bend, Toledo, Detroit, Cleveland, Pittsburgh, Philadephia, Newark, New York City, and will soon reach Baltimore, Washington, D. C., Akron, Tulsa, Oklahoma City, and Dallas.

9. MCI constructs microwave radio systems, which consist of various terminals and repeaters spaced approximately 20 to 25 miles apart which relay radio signals to transmit voice, data, facsimile or other communications services between designated cities. In each of the cities where MCI has a terminal and offers its service, MCI leases circuits from the local telephone company to link

MCI's terminal to its customers' premises.

10. Except for the coincidence that a customer of MCI may be located in the same building as an MCI terminal, interconnections with local loops provided by the local telephone company monopolies are necessary for the provision of point-to-point private line interstate business communications service by MCI.

11. Defendants are American Telephone and Telegraph Company (hereafter "AT&T") and its subsidiary, The Bell Telephone Company of Pennsylvania (hereafter "Bell of Pa."), both of which are communications common carriers subject to the Communications Act of 1934, as amended.

*The Services in Dispute*

12. As of November 14, 1973, MCI had under lease from Bell System companies 488 local distribution circuits to MCI terminals in eleven major cities along its routes, including Philadelphia and Pittsburgh. 327 of those circuits are already terminated in Bell System PBX's or key telephone sets, and 91 are to be terminated therein later.

13. However, Bell of Pa., as well as other local Bell companies have refused to provide MCI with four kinds of interconnection necessary for services which MCI appears authorized to provide and which MCI claims are provided to MCI's competitors. Those kinds of services for which interconnection is necessary are Foreign Exchange Service (FX), Common Carrier Switching Arrangements (CCSA), "interexchange" service, i. e., linkage between Bell defined metropolitan areas and areas more distant from MCI's towers, and "transiting" service, or the interconnection of the transmitting and receiving facilities of MCI and another common carrier.

14. FX (Foreign Exchange) service is a form of "switched" service, which allows a businessman located in one state to, in effect, maintain a local phone within another state. Under Foreign Exchange service, a businessman can be reached by customers in a different state and can himself reach another state through a telephone line which has the appearance to those customers of being a local telephone in their city.

15. As a specific example of a refusal by Bell to provide interconnection for interstate private line specialized common carrier service of the FX type, Bell of Ohio, the week preceding the hearing, on orders from AT&T, refused to permit MCI service to the Chilton Corporation. Another example was a refusal by Illinois Bell for Cone Mills.

16. Common Control Switching Arrangement (CCSA) is a private line system for linking the various offices of a large company through large switches on a local telephone company's premises instead of through the PBX switches on the customers' premises.

17. Although the private line circuits furnished in CCSA are provided for the exclusive use of the CCSA customer, the switching machines are shared with other private line service customers and message telecommunications service (MTS) and wide area telecommunication service (WATS) customers.

18. A specific example of a refusal by Bell to provide interconnection for interstate private line specialized common carrier service of the CCSA type arose when Illinois Bell refused to interconnect an MCI long haul interstate circuit in Chicago for the Westinghouse CCSA private line system.

19. Both FX and CCSA require interconnection with Bell terminating equipment on Bell premises; in other words, rather than merely interconnecting MCI's micro-wave towers to either Bell or customer owned equipment on MCI's customers' premises, the interconnections necessary to permit FX and CCSA requires Bell to interconnect MCI's customers with Bell's central switching facilities.

20. "Interexchange service" merely pertains to MCI's ability to connect with customers outside of the immediate area

surrounding its receiving and transmitting facilities. AT&T and the local Bell companies have refused to approve MCI's requests for interconnection lying outside of the Bell defined local distribution area, even though the customer to be serviced is not so far from the local distribution area as to require a long distance call. AT&T has offered to make interconnection beyond the local distribution area available to MCI if and when the FCC approves AT&T's proposed·hi-lo tariff. FCC approval of the proposed hi-lo tariff, by enabling the local Bell companies to vary their long-distance rates according to the costs of servicing particular routes, would allow AT&T to match if not undercut MCI's rates for servicing those routes.

21. The approval of the hi-lo tariff by the FCC is not a legal pre-requisite for the AT&T's furnishing of interexchange interconnection to MCI.

22. As specific examples of refusal by Bell to provide interconnection for interstate private line specialized common carrier service to communities outside Bell's local distribution area, service to St. Charles and St. Peters, near St. Louis, have both recently been refused by Southwestern Bell. An MCI customer, Santa Fe Pipeline, was lost (either to AT&T Long Lines or to Western Union) as a result of this refusal by Bell to permit interconnection.

23. Transiting is the provision of telephone company facilities to interconnect the terminals of two different specialized common carriers. Bell has refused to permit transiting interconnection between specialized common carriers. Customers cannot use N-Triple-C from Omaha to Chicago, and MCI from Chicago to New York, because Illinois Bell refuses to provide circuits from the N-Triple-C terminal to the MCI terminal. The terminals are approximately one mile apart.

24. Mr. Woods, of Bell, stated that Bell would be willing to modify its tariffs to provide for transiting service.

*Negotiations between MCI & AT&T to Date*

25. Following the FCC's orders in the MCI case (Docket 16509) and in Docket 18920, Illinois Bell and Southwestern Bell negotiated and entered into interim contracts with MCI, which permitted MCI to connect its Chicago and St. Louis microwave terminals to the customers' premises and thus provided overall MCI service from a customer's premises in one city to that customer's premises in another city (end-to-end service). The interim contracts also provided for special construction and special facilities on an individual case-by-case basis where required.

26. MCI commenced operations between Chicago and St. Louis in January 1972, and has placed or is about to place additional routes in operation between Chicago and New York via Pittsburgh, from Washington to New York via Philadelphia and from St. Louis southwest to Dallas during the latter half of 1973.

27. AT&T and MCI have been negotiating since March of 1971 concerning the kinds of interconnection that would be provided MCI and the terms and conditions of their provision.

28. During the latter part of the summer of 1973, AT&T broke off negotiations with MCI and submitted tariffs for approval by the state Public Utilities Commissions in those states where MCI sought interconnection terminating in Bell supplied equipment. Pending state approval of these tariffs, Bell refused to provide interconnection to MCI if such interconnection terminated in Bell supplied equipment. These tariffs now appear to have been approved in every state except New Jersey.

29. On November 12, 1973, AT&T filed, under protest, tariffs covering interconnection terminating in Bell supplied equipment with the FCC.

30. These tariffs, even if and when approved by the FCC, will not permit MCI to interconnect for the provision of FX, CCSA, interexchange, or transiting

services. These tariffs will only permit MCI to interconnect when such interconnection terminates in customer provided, or Bell provided equipment on the customer's premises. As stated before, FX and CCSA require interconnection with Bell equipment on Bell premises, while transiting does not entail terminating at the customer's premises at all.

31. In no state does MCI get interconnection for FX, for CCSA, for transiting, or for service outside the local distribution area.

*The Situation in Pennsylvania*

32. Under a written agreement dated May 14, 1973, Bell of Pa. agreed to lease local distribution facilities to MCI from the latter's terminals in Philadelphia and Pittsburgh to any point in the Philadelphia and Philadelphia Suburban Exchanges and the Pittsburgh and Pittsburgh Suburban Exchanges, respectively, consisting of 714 and 516 square miles, respectively.

33. Although the contract negotiated between Bell of Pa. and MCI had been signed May 14, 1973, it was not until the last week in August of 1973 that Bell of Pa. got down to preparations for filing an application with the Pennsylvania Public Utilities Commission for a state tariff to cover MCI's interstate communications services.

34. Pursuant to this agreement, at the time defendants filed their tariffs with the Pennsylvania PUC, Bell of Pa. had already filled MCI's orders for 66 of the 95 circuits requested at Philadelphia and Pittsburgh, and plans to fill by their respective due dates the orders for 26 of the remaining 29 circuits. The 3 circuit orders that Bell of Pa. has refused to fill are orders to serve customers outside the local distribution areas.

35. Pending approval of the tariffs submitted to the Pennsylvania Utilities Commission by Bell of Pa., no interconnection was provided to MCI's customers in Pennsylvania.

36. The approval of Bell of Pa.'s tariffs by the Pennsylvania Utilities Commission will allow Bell of Pa. to restore its previous interconnections to MCI's customers and to fill those orders placed with it by MCI, save for the three circuit orders noted in finding No. 34, *supra.*

37. MCI has an unspecified number of orders involving FX, CCSA, and interexchange services which it would place with Bell of Pa. but for Bell's stated policy of refusing interconnection in relation to such services.

*Jurisdiction*

38. Plaintiffs petition this Court to issue a preliminary mandatory injunction to compel the defendants, and AT&T's telephone operating company subsidiaries, to interconnect their communications systems to certain facilities of plaintiffs so as to permit plaintiffs to provide the services specified in Exhibit 2 to the Complaint, viz., (1) foreign exchange service ("FX"); (2) transiting facilities, to interconnect the local terminal facilities of one or more specialized common carriers; (3) common control switching arrangements ("CCSA"); (4) interexchange connection to customers' premises located outside the local distribution areas of the telephone companies serving those areas.

39. Plaintiffs claim that this Court has jurisdiction under § 406 of the Communications Act of 1934, 47 U.S.C. § 406.

40. Section 406 requires, inter alia, that a common carrier's violation of a provision of the Communications Act prevents plaintiff from receiving similar communications services on similar terms or conditions as other customers of the common carrier.

41. Western Union has, for years, had interconnection with the local telephone companies for the provision of specialized business communications.

42. In providing services to its customers in competition with MCI, Western Union relies on interconnection facilities of the local Bell System telephone

company as well as those of AT&T. Defendant Bell of Pennsylvania and the other Bell System companies furnish interconnection facilities to Western Union which permit Western Union to extend its private line interstate services beyond narrowly defined "local distribution areas," while refusing to furnish MCI or its customers such facilities for MCI's like communications services.

43. Western Union obtains numerous types of interconnections and services from Bell operating companies that are not available to MCI. Included among them are interexchange facilities, special circuits such as wide-band, unloaded wire pairs, and interconnection for service to nearby communities outside the Bell local distribution area.

44. The following privileges are afforded to Western Union by AT&T under Contract No. 1 but are not made available to MCI:

(a) Western Union can order special circuits and equipment including wideband carrier.

(b) Western Union can obtain pole attachments and duct space for carrier distribution.

(c) Western Union can connect with other carriers.

(d) Western Union can connect between premises of multiple customers.

(e) Western Union can connect between multiple premises of a single customer or multiple locations on single premises of a customer.

(f) Western Union can connect between interexchange circuits of Western Union or between such circuits and its offices such as a business office.

(g) Western Union has guaranteed availability of circuits in any exchange area and AT&T has guaranteed expeditious construction if the facilities requested do not exist.

(h) Western Union can specify a particular gauge of wire, per pair of wires in a cable or per wire on open wire.

(i) Western Union's contract has a duration of five years with an automatic renewal and can only be terminated by five years written notice.

(j) Western Union is not limited to a local distribution area as is MCI.

(k) Western Union has service access to all exchanges operated by the Bell System.

45. MCI has been trying explicitly to get equal treatment with Western Union from Bell at least since September of 1972.

46. Under AT&T's Interstate Private Line Tariff 260, AT&T Long Lines, in conjunction with the local telephone companies, can provide FX or CCSA service in any area of the country. AT&T Long Lines is also free to serve communities outside of Bell defined local distribution areas.

47. Long Lines provides the operating companies the ability to connect, as MCI can, but it is able to connect directly to CCSA switches while MCI is not, despite the fact that the circuit between the switches is a full-time circuit in the case of both Long Lines and MCI.

48. AT&T Long Lines provides no services completely on its own. While the Bell witnesses asserted that the local Bell telephone companies don't provide interconnection for AT&T Long Lines service offerings such as FX and CCSA, but that they provide the services together, in partnership, some form of interconnection, whatever it is called, appears necessary for the Long Lines Department interstate circuits and the local Bell telephone company distribution to be able to work together in the provision of the Tariff 260 private line services. AT&T Long Lines is a functional competitor of MCI in this sense, since both provide point-to-point interstate private service, and since both depend on interconnection by the local telephone companies to complete ("terminate") their service.

49. Local Loops are provided by the local telephone companies for the provision at AT&T Long Lines Department

of point-to-point private line interstate business communications services comparable to those MCI seeks to provide.

50. Other independent communications companies, such as independent (non-Bell) telephone companies, regularly interconnect with Bell companies for the provision of CCSA and FX service.

51. The tariff filed by MCI, of which the Court can take judicial notice, and which is effective under FCC rules, contemplates the offering of FX services and the interconnection with CCSA networks.

52. By reason of the Bell System's refusal to furnish interconnection facilities to permit MCI to provide its customers with (a) FX services, (b) interconnection with CCSA networks, or (c) any services in communities located outside the "local distribution areas" established by the Bell System, MCI is prevented from receiving service from the Bell System upon terms and conditions as favorable as those given for like communication under similar conditions to other persons.

*Plaintiffs' Probability of Success on Merits*

53. Bell includes FX and CCSA in the category of private line service in their tariffs and in all of their private line sales literature, manuals, and the like. The F.C.C. has viewed both FX and CCSA as subclasses of private line service.

54. AT&T Tariff F.C.C. 260, entitled Private Line Service, "contains the regulations and rates applicable to Private Line Service furnished for interstate or foreign communications by the AT&T Long Lines Department . . . or by AT&T in conjunction with concurring, connecting or other participating carriers or by concurring carriers or by concurring carriers in conjunction with connecting or other participating carriers . . ."

Private Line Service is further described on 4th Revised Page 13 of Tariff 260 as "the furnishing of telephone company facilities for communications between specified locations continuously or for regularly recurring periods at stated hours. Facilities may be those of the telephone company only, or those of the telephone company and other participating carriers."

55. One of the types of channels provided within the Private Line Tariff F.C.C. 260 is Series 2000 channels, specifically Type 2006—"approximate bandwidth of 300–3000 hertz. Furnished in connection with Foreign Exchange Service," or FX, as referred to herein.

In addition to the previous characteristics described, AT&T's Tariff F.C.C. 260 quotes the following words covering Type 2006 channels:

These channels are furnished to permit customer to obtain individual line or private line exchange trunk connection in an exchange foreign to the exchange in which the customer is located.

These channels are furnished normally on a 2-point basis, and where facility conditions permit, a third point may be added. Channels furnished on a 2-point basis may be arranged for reversible exchange operation.

These channels may be used for data transmission subject to the provisions of 2.1.4(A)(4) and 2.6 preceding.

When non-reversible channels are furnished, exchange service connection is provided at only one of these points.

When reversible channels are furnished, exchange service connections are provided at two points, but only one such connection can be established at a time. Reversible operation is controlled by the customer at will.

56. AT&T's Private Line Service Tariff 260 defines common control switching arrangements as follows:

Arrangements on Telephone Company premises provided to interconnect channels for private line telephone service (Type 2001) and alternate private line telephone-data (alternate send and receive only, Type 2003

channel) service. Use of the common control switching equipment for this arrangement is shared with other service offerings or customers. This arrangement may be ordered only at exchanges in which customer premises are connected to the service.

Types 2001 and 3002 are among the channel types which Bell specifically offers for connection with other common carrier services. Furthermore, the paragraph following its list of approved channel types, Bell states that

> Where the connection of an Other Participating Carrier-provided communications system is by means of a direct electrical connection, such connection shall be made through switching equipment provided either by the customer, authorized user, joint user, the Telephone Company or such Other Participating Carrier.

CCSA is Telephone Company-provided switching equipment.

57. While FX and CCSA are not mentioned specifically by title or initials in Docket 18920, 29 F.C.C.2d 870 (1971), which was largely responsible for bringing plaintiffs and the other specialized common carriers into being, neither are the other private lines services such as "tandem tie-lines," "hot lines," and "automatic ring-down" mentioned therein.

58. MCI and the other specialized common carriers have been authorized to provide a wide range of communications services for business and government. The F.C.C. has never indicated in any way to MCI any doubt that MCI and the other specialized common carriers are authorized to provide FX and CCSA private line services. On the contrary, it has been made clear in Docket 18920, in the Commission's Order of October 4, 1973, and in the October 19, 1973 letter of Bernard Strassburg, Chief of the Common Carrier Bureau, that MCI is authorized to provide these and a full range of other private line services for business and government.

In the Specialized Common Carrier decision in Docket 18920, the F.C.C. had before it for consideration the full range of private line services and it contemplated competition by the newly authorized carriers in the provision of *all* of those services. For example, in paragraph 34 of its decision, the Commission noted:

> In 1969, AT&T's reported revenues from toll private line services (excluding video) accounted for only $561,216,383 or 3.5 percent of its total operating revenues of $16.1 billion . . . Even assuming the unlikely event of a total diversion of such revenues, the effect would be minimal.
> . . .

If the Commission contemplated the "total diversion" of revenues from these services, however unlikely, it clearly contemplated the provision of *all* services, including CCSA and FX, by AT&T's competitors.

In quoting the F.C.C.'s staff analysis in the Notice, the Commission's opinion states:

> It is important to recognize that we are concerned with only a relatively small percentage of established common carrier service to the public. For example, AT&T's present interstate business constitutes only about 30 percent of the Bell System's total business; about 87 percent of the interstate revenue is from message toll telephone and wide area telephone service (WATS) and these latter services have an annual growth rate of about 15 percent. None of the applicants propose to provide this type of service and we see no reason to expect any undesirable effects upon these services. An examination of AT&T's private line, program transmission and other more specialized services indicates that an estimate of the proportion of AT&T services that is vulnerable to competitive inroads would be on the order of 2–4 percent of its existing total business.

29 F.C.C.2d at 285. The staff specifically singled out and excluded from consideration the WATS service. Had it contemplated that FX and CCSA services *were not* included, it would clearly have made specific reference to them at this point.

59. In the F.C.C. proceedings leading up to the opinion in Docket 18920 "private line" was taken to include FX and CCSA.

The F.C.C.'s Notice with respect to Docket 18920 made it clear that the full range of services in private line communications was going to be considered by the Commission in that proceeding. In the Notice it was stated:

We do not undertake to describe each of the many systems that have been proposed, or to summarize in detail each of the opposing arguments and counterarguments. The following major or typical proposals and arguments will sufficiently exemplify the kinds of applications and oppositions to serve as a basis for discussion.

\* \* \* \* \* \*

There are also pending a number of applications by MCI associated companies for portions of a proposed nationwide network to provide specialized private line communications services. . . . The various MCI applications propose to provide "customized" communications channels, tailored to the exact requirements of subscribers needing interoffice and intracompany communications, to meet newly developing data and specialized communications needs of the public at significantly low cost. The channels would accommodate transmission of data, facsimile, control, remote metering, voice and other forms of communication. MCI does not now propose to provide end-to-end service. Local loop interconnection may be accomplished by the subscriber's private facilities or, for subscribers requiring only voice grade channels, by use of local landlines of existing telephone companies.

Finally, the issue of interconnection for the provision of all services was expressly addressed in the Notice at paragraph 67, where the Commission referred to the previous MCI decision:

67. In the MCI case, the Commission retained jurisdiction over the interconnection issue, stating that an order requiring the established carriers to provide loop service would be issued unless it is shown that interconnection is not technically feasible (18 F.C.C.2d at 965; 21 F.C.C.2d at 193). The local exchange facilities of the Bell System and independent telephone companies presently constitute almost the sole means for local distribution of interstate common carrier services. . . . Western Union is almost entirely dependent on the Bell System for its local distribution. If access to local facilities is requested and needed by the applicants, we would expect the local carrier—Bell or other carrier—to permit interconnection or leased channel arrangements on reasonable terms and conditions to be negotiated with the new carriers. In other words, where a carrier has monopoly control over essential facilities we will not condone any policy or practice whereby such carrier would discriminate in favor of an affiliated carrier or show favoritism among competitors. Customers of any new carrier should also be afforded the option by the local carrier to obtain local distribution facilities under reasonable terms set forth in the tariff schedules of the latter.

60. Although the services which MCI proposed to offer the public in its comments in Docket No. 18920 did not include switching services such as FX or CCSA, the Commission's hearing and order in Docket No. 18920 embraced these services, and MCI has subsequently been authorized to provide these services.

61. The Commission's letter of October 4, 1973, was an Order of the F.C.C.

62. The Commission's Order of October 4, 1973, contemplated that the defendants would provide all interconnection necessary for the specialized carriers to provide the services they were authorized to provide:

" . . . [O]ur MCI and *Specialized Common Carrier* decisions made it clear that Bell System companies and other established carriers which have a monopoly control of exchange facilities would be expected to provide, on reasonable terms and conditions, interconnection of such facilities as required by the specialized carriers to terminate the services which such specialized carriers have been duly authorized in the public interest by this Commission to provide."

The Commission also stated:

"Furthermore, it has been alleged that it has been the policy of the local companies of the Bell System not to furnish exchange facilities to specialized carriers or their customers for certain services which those carriers are authorized to provide and which would be in direct competition with services offered by AT&T."

\* \* \* \* \* \*

" . . . [T]here should be no delay in honoring requests of specialized carriers for interconnection facilities required by such carriers. . . ."

FX and CCSA were included specifically in the last paragraph in page 2 of the Commission's Order of October 4, 1973, not by name, but the paragraph deals with FX and CCSA.

63. The staff and the Commission were aware prior to the Commission's Order of October 4, 1973, from complaints not only of MCI, but also from Datran and N-Triple-C, that there were problems in obtaining interconnection for FX and CCSA.

64. Bernard Strassburg, Chief of the F.C.C. Common Carrier Bureau was authorized by law to issue the advisory letter of October 19, 1973, admitted into evidence.

The Common Carrier Bureau letter of October 19, 1973, specified that plaintiffs were entitled to interconnection to provide the following categories of service:

"1. Interstate service, comparable to AT&T's Series 2006–FX service offered under AT&T interstate Tariff 260, involving an MCI interstate circuit connected at our terminal to a business telephone arrangement supplied by the telephone company serving that area.

2. Authorized interstate services on a through basis utilizing local connecting facilities of the telephone company serving the area to interconnect the local terminal facilities of one or more specialized common carriers.

3. Interstate private line services connecting CCSA facilities, involving connection of MCI's terminal to the telephone company supplied CCSA facilities as is now done for AT&T when offering this service under its interstate Tariff 260.

4. Interstate services terminating at customers' premises located in communities nearby to cities where MCI's terminals are situated, but outside the local service areas as defined by the telephone company serving that area. These services require forms of interconnection regularly made available to Western Union and to AT&T's Long Lines Department, and include situations where part of the circuit to a remote customer's location is supplied by a second telephone company."

65. Part 21.703 of the F.C.C. Rules allows the Domestic Public Point-to-Point carriers such as MCI to provide services such as FX and CCSA as long as such services are included in their tariffs filed with the F.C.C.

66. MCI has filed tariffs with the F.C.C. covering the provision of FX, CCSA and interexchange services.[1] Al-

---

1. Although the original of these tariffs were not submitted in evidence in the hearing on the preliminary injunction, the Court may take judicial notice of both them and the

though the MCI tariff does not mention these services by name, the tariff offerings for the general types of services which defendants denominate FX and CCSA are covered at page 21.1 of MCC Tariff F.C.C. No. 1, Section D, paragraph 4.01. MCI does not normally utilize, as do defendants, terminology such as FX, CCSA, or numbered series offerings, e. g. 2000, 3000, 5000, etc. MCI does not use "tandemn tie-line" in its tariff or other designations for services for which Bell is currently providing interconnection. Reference in Paragraph 4.01 of MCI's tariff to the provision of "voice service . . . (which) may be interconnected with the facilities of other communications carriers and users for a customer's communications needs, such as voice connecting arrangements" refers to such services as FX and CCSA.

67. The Notice of Inquiry to Formulate Policy, Notice of Proposed Rulemaking, and Order, Docket No. 18920, 24 F. C.C.2d 318, (1970) specifically refers to section 201(a) of the Communications Act.

68. Over 200 interested parties, including defendant AT&T, filed comments with the Commission and participated in a two-day hearing in Docket No. 18920.

69. Defendant AT&T either did present or had the opportunity to present its full range of arguments against the authorization of the specialized common carriers to provide the services in question in the present case.

*Irreparable Injury to Plaintiffs*

70. The present size of the private line interstate communications market in the United States is close to $1,000,000,000 per year.

71. FX private line service is economically extremely significant. According to Bell's F.C.C. filings, approximately $300,000,000 per year of the interstate private line communications

business is FX. ARINC, one private line customer, does approximately $35,000,000 per year FX business alone.

72. CCSA private line service is also economically very significant. It constitutes $120,000,000 of AT&T's interstate private line business.

73. MCI presently has $7,000,000 in cash or marketable securities. MCI has a current liability (indebtedness) of $10,600,000.

74. MCI has a monthly operating expense of $2,400,000, of which $683,000 represents fixed costs.

75. MCI has borrowed $64,000,000 from lending institutions to cover the costs of constructing its transmission network. Restrictions imposed by the borrowers prevent this capital from being used to defray operating expenses.

76. MCI presently has an approximate annual revenue of $500,000.

77. MCI presently has a backlog of private line circuits totaling 1500 circuits which represents revenues of $700,000 monthly or an annualized revenue of 9.48 million.

78. Of this backlog, 380 circuits have been processed by MCI and have been presented to AT&T local companies, but are yet unfulfilled by Bell. This category of circuits represents a monthly revenue of $190,000.

79. Six Hundred Forty circuits in this backlog have not yet been processed by AT&T but there is no foreseeable problem with their acceptance by AT&T local companies. This portion of the backlog represents monthly revenues of $320,000.

80. The remaining circuits have not been presented to AT&T's local companies because they involve FX, CCSA, or interexchange interconnections. These circuits represent monthly revenues of $280,000, or $3,360,000 annually.

81. In addition, since November 2, 1973, MCI has received 200 new orders.

tariffs filed with the Pennsylvania Utilities Commission by Bell of Pa.. Dispatch, Inc. v. City of Erie, 364 F.2d 539 (3rd Cir. 1966).

The parties have submitted certified copies of these tariffs for the Court's convenience.

About one-half of these, representing annual revenues of approximately $600,000 cannot be filled by AT&T's local operating companies because they involve FX, CCSA, or interexchange interconnections.

82. All but 3 of the circuits for which interconnection was sought from AT&T by MCI in Pennsylvania, and all of the circuits applied for in Philadelphia can now be connected by Bell of Pa. under the tariffs filed by Bell of Pa. with the Pennsylvania Utilities Commission on September 30, 1973, and approved by that Commission on November 30, 1973.[2] These tariffs cover the situation where a customer of MCI requests (or MCI requests for him) that MCI circuits be connected with Bell terminal equipment (key telephones, PBX switchboards, etc.) located on the customer's premises.

83. However, an unspecified number of circuits still cannot be submitted to Bell of Pa. for interconnection because they involve FX, CCSA or interexchange interconnection either in Pennsylvania or in another state wherein the circuit begins or terminates.

84. MCI is a developing company, whose ability to obtain funds from the capital markets depends upon its ability to compete profitably with AT&T's private line services. Its inability to receive interconnection for FX, CCSA, and interexchange services in the Eastern District of Pennsylvania will reduce its revenues and make it more difficult for MCI to remain solvent, let alone to grow.

85. As stated before, the MCI's estimated annual revenues including revenues from the backlog of FX, CCSA, and interexchange services exceeds $10,000,000, while its estimated annual revenue without the income from the provision of these services represents $7,200,000. The difference between these two figures represents a very significant figure in determining the future existence or non-existence of the plaintiffs.

86. The alternative for an MCI customer who has been forestalled by Bell from receiving MCI private line service is to turn to AT&T Long Lines or to Western Union.

87. When a customer cannot obtain FX service from MCI he must obtain it from AT&T.

88. If MCI cannot obtain interconnection in connection with CCSA service, when an MCI customer corporation grows to the point where it needs to use CCSA it has to drop MCI and obtain its interstate private line circuits from MCI's competition, the AT&T Long Lines Department.

89. If a customer cannot use the combined services of two specialized common carriers for his interstate business communications needs because Bell refuses to provide transiting interconnection circuits the customer, as a practical matter, must obtain his service from AT&T.

90. Customers tend, for economic reasons, to purchase their private line communications services from a single source. If the customer is unable to obtain a significant portion of his interstate business communications needs from a competitor of the Bell System, he will purchase all of such service from Bell.

91. Approximately $3,000,000 in new sales were generated by the favorable reaction to the F.C.C. order of October 4, 1973 in the three week period after the order.

92. Based on this, it is anticipated that upon a clear order of interconnection by the Court, there would be a substantial increase in the orders obtained by MCI, increased confidence on the part of the financial community, and there is a possibility that creditors would not press as hard.

93. MCI's officers have represented to MCI's stockholders that the company

2. See footnote 1, supra, p. 16.

could stay in business until March, 1974, even if it received no additional revenues. However, this would entail MCI's ending up with no cash reserves and out of business by March 31, 1974.

*Injury to Defendants*

94. The types of interconnection requested by MCI from defendants are technically feasible. There is some danger that malfunctions in the Bell switching system could result from the interconnection of MCI circuits, since there will be a lack of central planning and management of these interconnections. However, this danger seems no greater than that posed by Bell's interconnection with other common carriers which have been effected in the past.

95. Should it later be determined that these interconnections were improperly granted, these interconnections could be disconnected with little inconvenience to defendants. Private line customers of MCI, however, could be seriously inconvenienced by such disconnection.

*Impact upon the Public Interest of Injunction*

96. MCI is one of the leading—and one of the few—competitors of AT&T in the field of interstate private line service. Should MCI fold because of its inability to make the requested interconnections, or even if the lack of these interconnections would only stunt its growth, the public would be denied the benefits of vigorous competition for the private line market.

97. AT&T's success in disobeying the FCC's orders would deter potential competitors of AT&T from entering into competition with AT&T in the provision of private line services.

98. The issuance of the preliminary injunction will serve to uphold the integrity of the Communications Act and the FCC's orders and regulations under that Act.

CONCLUSIONS OF LAW

*Jurisdiction*

1. MCI has standing to bring suit under § 406 of the Communications Act, 47 U.S.C. § 406.

2. Defendants are common carriers subject to the Communications Act.

■ 3. Defendants have violated § 201(a) of the Communications Act.

4. By virtue of defendants' violations of a provision of the Federal Communications Act, plaintiffs are prevented from receiving service in interstate communication by wire or radio from defendants at the same charges or upon terms or conditions as favorable as those given by defendants for like communications or transmission under similar conditions to the Long Lines Department of defendant American Telephone and Telegraph Company, to the Western Union Telegraph Company, as well as to 1700 non-Bell telephone companies.

5. No purpose would be served by referring this matter to the Federal Communications Commission for resolution, since that agency has already issued final orders bearing upon the subject matter of this suit, and this Court is merely being called upon to enforce those orders.

6. This Court is authorized by the Congress in 47 U.S.C. § 406 to issue an order commanding defendants to furnish facilities for the communications or transmission sought by the plaintiffs.

*Injunction*

7. Plaintiffs have made out a substantial probability that they will succeed on the merits in a final hearing.

8. Plaintiffs have been authorized by the Federal Communications Commission to provide certain interstate private line services, some of which will be in competition with services offered by AT&T. Among the private line services that MCI has been authorized to provide are Foreign Exchange Service ("FX"), Common Carrier Switching Arrange-

ments ("CCSA"), Interexchange service ("IX"), and, in order to provide these services, interconnection between the terminals of two common carriers ("transiting").

9. In order to allow MCI and the other specialized common carriers to provide these services, the Federal Communications Commission ordered AT&T and its local operating subsidiaries to allow interconnection with Bell equipment. The F.C.C.'s orders in this matter include interconnection for the provision of FX, CCSA, and interexchange service.

10. The letter from Dean Burch, in which a majority of the Commission jointed, to Daniel E. Emerson, Vice-President of AT&T, dated October 4, 1973, is an order of the Commission.

11. The letter from Bernard Strassburg, Chief of the Common Carrier Bureau of the F.C.C., to Laurence E. Harris, Vice-President of MCI Telecommunication Corporation, specifying the types of private line services which MCI was authorized to perform, is not a binding interpretation of the Commission's order in Docket No. 18920 or its October 4 order since the Commission's regulations do not delegate to the Bureau Chief the power to interpret the Commission's orders. However, the Bureau Chief is delegated the power to advise and assist the public in understanding the various regulations announced by the Commission, and the Strassburg letter can be taken into account by the Court as an advisory, rather than a binding opinion.

12. The testimony of Kelly E. Griffith, Division Chief within the Common Carrier Bureau of the F.C.C., cannot be accepted by this Court as expert opinion testimony as to the substance of the Commission's orders since the Court is as competent as is a staff member of the Commission to interpret the Commission's orders.

13. The hearing afforded defendants in Docket No. 18920 satisfies the requirement in § 201(a) of the Communications Act that a hearing be held before the Commission could order physical interconnection between carriers.

14. The Federal Communications Commission, and only the Federal Communications Commission, has jurisdiction over the interconnection arrangements between common carriers that are necessary for the provision of such interstate private line services such as FX, CCSA, or interexchange. Defendants may not delay compliance with orders of the FCC on account of filings with state regulatory commissions, since these bodies lack authority over communications facilities when those facilities are used to terminate interstate services.

15. MCI will be irreparably injured absent the issuance of a preliminary injunction mandating the requested kinds of interconnection.

16. The injury to MCI if no injunction is issued outweighs the injury that would be caused to defendants by the injunction.

17. The public interest will be served by the issuance of a preliminary injunction.

OPINION AND ORDER

This is a complex case. However, fortunately for plaintiffs, it does not derive its complexity from the technical intricacies or mysteries of the industry in question, the communications industry, but rather from the law that has evolved from the regulation of that industry. This state of affairs is fortunate for the plaintiffs because had it appeared that the Court would have had to master the technical intricacies of the communications industry in order to render a rational judgment, the Court would have instead referred this matter to the Federal Communications Commission for resolution. Because a federal district court should be competent to interpret statutes and decisions—including the decisions of the Federal Communications Commission—this Court has not felt obliged to transfer this matter to the Commission. Nevertheless, the complexity of the legal issues involved in this

case requires more elaborate discussion than that given in the foregoing conclusions of fact and law. Therefore, this Opinion will deal at length with the questions of this Court's jurisdiction under § 406 of 47 U.S.Code ("The Communications Act"), the scope of the authorizations for private line services granted to MCI by the FCC, the liability of AT&T under § 202 of the Communications Act, and, finally, the exclusivity of federal as opposed to state regulation of the facilities necessary to provide the services involved in this suit. All of these questions are crucial in determining whether plaintiffs have shown a reasonable probability of success on the merits at a final hearing, one of the tests for a grant of a preliminary injunction, and also in determining whether plaintiffs have stated a valid cause of action under the Communications Act, an issue raised by defendants' motion to dismiss filed shortly after plaintiffs filed their motion for a preliminary injunction.

It is felt that the facts of this case, the identity of the parties, and the extent that both the parties and the public would suffer if an injunction was either issued or denied, has been adequately covered by the Court's findings of fact.

## I. JURISDICTION

■ Jurisdiction in this Court is based on 47 U.S.C. Chapter 406. This Section states:

*"The district courts of the United States shall have jurisdiction upon the relation of any person alleging any violation, by a carrier subject to this chapter, of any of the provisions of this chapter which prevent the relator from receiving service in interstate or foreign communication by wire or radio . . . from said carrier at the same charges, or upon terms or conditions as favorable as those given by said carrier for like communication or*

transmission under similar conditions to any other person, *to issue a writ or writs of mandamus against said carrier commanding such carrier to furnish facilities for such communication or transmission to the party applying for the writ. . . ."*

In order to establish jurisdiction under this Section, a plaintiff must show that he is (1) "any person", that he has been (2) denied service by (3) a carrier subject to the Communications Act (4) in violation of a provision of that Act, and (5) the service which plaintiff is denied is provided by the carrier to others, or, that if the service is available to plaintiff, it is available to others on more favorable terms or conditions.

■ Before examining whether plaintiffs qualify under each element required for jurisdiction in a district court, it is important to explain the Court's interpretation of the relationship that must be shown between the alleged violation and the alleged discrimination. If the section is read so that it would be grammatically correct, it would seem that the provision of the Communications Act that plaintiffs assert defendants have violated must be a provision which prohibits discrimination between customers of the carrier. This is because the word "prevent" in the fourth line seems to take the word provisions in the third line rather than the word violation in the second line as its subject, which would lead to the conclusion that it is the provision of the Act rather than the violation which must relate to a discrimination among customers of a carrier. This grammatical interpretation would be fatal to plaintiffs' case here, since the Court has found that the only provision of the Act which AT&T and Bell of Pennsylvania have violated is § 201(a) of the Act, which does not relate to discrimination between customers of a carrier. However, the grammatical interpretation runs afoul of the common sense [3] interpretation of the Act

---

3. The Court has been given little guidance in interpreting § 406 by any cases that have pre- viously been decided under it. In fact, there have been only two such cases—both at-

in which the violation of the carrier must result in a discrimination against a customer of the carrier, but the provision of the Act being violated need not be concerned with such discrimination. For if provisions is seen as the subject of "prevent", the statute requires the federal court to uphold those provisions of the statute which *prevent* a customer of a carrier from receiving equal and non-discriminatory service, an absurd interpretation of the Act.

■ Plaintiffs easily qualify as "any person", and AT&T and Bell of Pennsylvania have stipulated to being carriers subject to the Act, thus fulfilling requirements (1) and (3). As to requirement (3), defendants maintain that interconnection as requested by the plaintiffs is not a service within the meaning of Section 406. They argue that the Act only envisions the furnishing of Bell's ordinary services to a customer and not physical interconnection with another carrier. This contention is without merit, as can be seen by a reading of those cases which have interpreted the Federal Communications Act. For example, the United States Court of Appeals for the Second Circuit has noted:

> "One of the stated purposes of the Communications Act was to make available to the people of the United States a rapid, efficient nationwide communication service with adequate facilities at reasonable prices. . . . Among other provisions, the Act requires communications carriers to furnish . . . facilities to any persons seeking communications service, § 406. . . ." (Ivy Broadcasting Co., Inc. v. AT&T, 391 F.2d 486, 490 (2d Cir. 1968).

Section 201 requires a carrier to provide service upon reasonable request,

and specifically provides for the provision by the carrier of physical interconnection with another carrier. Thus we have a Court explicitly linking the physical interconnection sections of the Act with § 406.

This leaves the question of the carrier's violation and the discriminatory effect of that violation as the only statutory prerequisites of jurisdiction still left open. The question of whether AT&T and Bell of Pa. have violated a provision of the Act is explored in depth below in those sections discussing the scope of the services that MCI was authorized by the FCC to provide.

■ This Court believes that plaintiffs have shown sufficient discrimination between the services, and the terms and conditions for those services, afforded to it by Bell of Pa. and those services, terms, and conditions provided by Bell of Pa. to AT&T Long Lines, a subsidiary of AT&T, and Western Union to satisfy the jurisdictional requirement of discrimination. This is true even though these discriminations do not rise to the level of a violation of § 202 of the Act as alleged by plaintiffs. This is because § 202 prohibits *unjust* or *unreasonable* discrimination in charges, practices, . . . facilities, or services for or in connection with like communications service, while § 406 merely provides a remedy for violations which result in a denial of services upon the same or similar conditions that it has offered to others.

■ Plaintiffs AT&T and Bell of Pa. claim that AT&T Long Lines, a division of AT&T, does not provide any private line services, such as FX or CCSA, by itself and is therefore not a competitor of MCI. Since AT&T Long Lines and the local Bell companies provide these

---

tempts by persons whose home telephone service has been discontinued after the telephone company had been informed by law enforcement authorities that the telephones had been used in connection with illegal gambling activities to force the telephone companies to reconnect their telephones. Neither of these attempts was allowed, since the telephone companies were required by

the federal or local communications commissions to discontinue service under such circumstances, and § 406 specifically prohibits a Court from determining the reasonableness of such regulations. Palermo v. Bell Tel. Co. of Pa., 415 F.2d 298 (3rd Cir. 1969); McBride v. W. U. Tel. Co., 171 F.2d 1 (9th Cir. 1948).

services jointly, and since MCI does not want to enter into joint service or file concurrent tariffs with the local Bell companies, AT&T asserts that MCI cannot claim that it is being discriminated against. We do not believe that defendants can duck the question of competition this easily. AT&T Long Lines function is to connect the local Bell monopolies which allows them to provide their customers with both interstate toll and private line services. Local Bell interconnection is necessary for the provision of these services, just as it is for the provision of similar services by MCI (unless, of course, the customer himself can connect his business with MCI's transmitters). The fact that the local Bell companies or independent phone companies file their tariffs with the appropriate regulatory agencies concurrently with AT&T Long Lines and that they divide their revenues with Long Lines rather than charging Long Lines a fixed fee for the interconnections ("termination") should not obscure the functional equivalence of the services the local companies provide Long Lines and the services they are asked to provide MCI.

██ The FCC has recognized this functional equivalence in its Order in Docket 18920 and its Order[4] of October 4, 1973:

". . . [o]ur *MCI* and *Specialized Common Carrier* decisions made it clear that Bell System companies and other established carriers which have monopoly control of exchange facilities would be expected to provide on reasonable terms and conditions, interconnection of such facilities as required by the specialized carriers to terminate the services which such carriers have been duly authorized in the public interest to provide. Recognizing that such services would in many respects be in competition with existing or new services offered by the established carriers, *we stressed that we would not condone any discrimination by an established carrier in favor of an affiliate thereof* or any favoritism in the treatment of different competing carriers." (Letter from Dean Burch to Daniel E. Emerson, Vice President of AT&T dated October 4, 1973.)

Clearly the "affiliate" that the FCC had in mind when it issued this order requiring interconnection so that MCI could furnish interstate private line service was AT&T's Long Lines Division. Defendants have presented nothing to this Court that the FCC did not have before it when it categorized Long Lines as MCI's competitor, and this Court can find no good reason to disregard the FCC's categorization of Long Lines as MCI's competitor.

██ There are numerous examples in the record of the Bell companies providing Long Lines with kinds of interconnection which they deny to MCI. The record also provides examples of AT&T discrimination in favor of Western Union over MCI, particularly in the matter of interexchange connections. (MCI has submitted an exhibit prepared by the White House office on Telecommunications Policy outlining the differences in treatment as between Western Union and MCI ranging from supplying of cable to life of contracts. In nearly all of these terms, Western Union is preferred over MCI). The Court is convinced that MCI has shown a pattern of discrimination against it sufficient to satisfy the jurisdictional requirements of § 406.

██ One non-statutory prerequisite of jurisdiction with which the Court must concern itself in litigation touching upon, as does this one, an administrative agency's regulatory scheme is the doctrine of primary jurisdiction. The

---

4. Defendants have characterized the October 4 action of the Commission in this matter as a "letter" rather than an order. An order of the Commission is not less than an order because it is in letter form. Red Lion Broadcasting Co. v. F. C. C., 127 U.S.App. D.C. 129, 381 F.2d 908, 910 (1967) aff'd 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

doctrine of primary jurisdiction has been enunciated by the courts in order to avoid a conflict between the courts and an administrative agency arising from either the court's lack of experience with the subject matter of the agency's regulation or from contradictory rulings by the agency and the court. Under this doctrine, a court should refer a matter to an administrative agency for resolution, even if the matter is otherwise properly before the court, if it appears that the matter involves technical or policy considerations which are beyond the court's ordinary competence and within the agency's particular field of expertise. Far East Conference v. United States, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952); Texas Pacific Railroad v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907); Laveson v. Trans World Airlines, 471 F.2d 76 (3rd Cir. 1972). However, there is no set formula for determining whether a particular case should be referred to an administrative agency. As the Supreme Court has stated:

"... In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation. ... ." (United States v. Western Pacific Ry. Co., 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed. 2d 126 (1956)).

The Court has determined that the purposes of the primary jurisdiction doctrine would not be served by a preliminary referral of this matter to the FCC. First, the questions raised by the plaintiffs' motion for a preliminary injunction and defendants' opposition to it are all within the ordinary experience of the judiciary; the Court is not being asked to decide whether interconnection is necessary, convenient or in the public interest, nor is it being asked to pass upon the reasonableness of tariffs filed with the FCC.[5] Second, a preliminary referral to the FCC would be futile because the FCC, in its orders in Docket No. 18920 and in the letter to AT&T's Emerson dated October 4, 1973, has already passed upon the question of the scope of AT&T's duties in the present matter.[6] Third, the fact that the FCC has already ruled upon the interconnections in question removes the danger of inconsistent rulings, since this Court will merely be enforcing the FCC's or-

---

5. In light of the absence of a question of the reasonableness of a tariff, defendants' reliance on Philco Corporation v. American Telephone & Telegraph Co., 80 F.Supp. 397 (E.D.Pa.1948), as an authority for referral to the FCC seems misplaced. In that case the reasonableness of tariffs filed with the FCC was squarely in issue. Nor does AT & T's filing on the eve of trial tariffs relating to the issues raised in this case put this case within the ambit of *Philco*, since the Commission's order of October 4 calls upon defendants to furnish interconnection to MCI for the services it is authorized to provide "[u]ntil such tariffs are filed and effective," the latter requiring FCC approval. (Letter from Dean Burch to Mr. Daniel E. Emerson, Vice-President of AT & T, Oct. 4, 1973, at page 3)

6. The Court is aware of current proceedings in the Commission that bear on the issues raised in this suit. In The Matters of Bell System Tariff Offerings, Docket No. 19896, Memorandum Opinion and Order to Show Cause, December 12, 1973. In its Order of December 12, 1973, the Commission scheduled oral argument for March 4, 1974 on, inter alia, the scope of the FCC's order in Docket No. 18920 and its order of October 4, 1973, as well as the legality of the tariffs which AT & T filed with the state utility commissions. However, the fact that the Commission will bear argument on these questions as part of a show cause order does not establish primary jurisdiction in that agency or render AT & T's duties under the Act too uncertain for mandamus, because the show cause hearing is merely part of the Commission's enforcement procedures and not an integral part of its deliberative or adjudicative procedures. As we have stated elsewhere, (see p. 9 infra) the enforcement powers which the Communications Act lodges in the Commission are not incompatible with the enforcement powers granted to the district court by Section 406. These remedies are not mutually exclusive, and an aggrieved party need not wait until every enforcement procedure which the Commission can bring has run its course before he can bring an action under Section 406.

ders. Defendants ask us to find some special significance from the FCC's order in Docket No. 18920 which states that the FCC retains jurisdiction over the interconnection necessary to effectuate the policies enunciated in Docket 18920 and that ". . . [the FCC] will act expeditiously to take such measures as are necessary and appropriate in the public interest to implement and enforce the policies and objectives of this decision." 29 FCC 2d at 940. The retention of jurisdiction by the FCC does not negate jurisdiction in this Court under § 406; Congress in giving the mandamus (injunction) power specified in § 406 to the district courts, did not envision the FCC losing the power to enforce its own orders, and the opposite situation, the courts lacking power until the FCC expressly yields jurisdiction, would be equally illogical. See discussion of § 23 of the Interstate Commerce Act, which is the analogue of § 406, in Baltimore & Ohio R.R. v. Pitcairn Coal Co., 215 U.S. 481, 499–500, 30 S.Ct. 164, 54 L.Ed. 292 (1910).

 One possible jurisdictional obstacle remains. Section 406 provides for the issuance of a writ of mandamus by the District Court should it find that all the conditions set forth in the section exist. Writs of mandamus were abolished with the adoption of Rule 81(b) of the Federal Rules of Civil Procedure. The result of this change was to substitute a motion for an injunction for a prayer for mandamus, thus relieving the necessity of pleading in relator form, McBride v. Western Union Tel. Co., 171 F.2d 1 (9th Cir. 1948), but it appears that the substantive rights of the parties are still governed by the principles which have formerly been applied in mandamus cases. Rines v. Com. of Pa., 285 F.Supp. 391 (E.D.Pa.1968). Therefore, before this Court could issue a mandatory relief in the nature of mandamus against defendants, their duties under the Act would have to be clear and unequivocal. As the Supreme Court stated in construing § 23 of the Inter-

state Commerce Act, a section comparable to § 406:

" . . . The remedy afforded by that section in the cases which it embraces must be limited either to the performance of duties which are so plain and so independent of previous administrative action of the Commission as not to require a prerequisite exertion of power by that body, or to compelling the performance of duties which plainly arise from the obligatory force which the statute attaches to orders of the Commission. . . ." (Baltimore & Ohio R. R. v. Pitcairn Coal Co., 215 U.S. 481, 499–500, 30 S.Ct. 164, 171, 54 L.Ed. 292 (1910)).

 We are persuaded that defendants' duties have been made sufficiently clear by the Commission's orders to enable this Court to issue an injunction even under the strict principles enunciated above. The "prerequisite exertion" contained in the Commission's orders removes all discretionary factors from the Court's purview, leaving only the enforcement of the duties set forth in those orders. The fact that the types of interconnection requested by MCI are not specifically mentioned in these orders does not defeat an injunction under the general mandamus principles. The Court feels that their incorporation by reference in the order is clear enough to justify mandamus. (See Section II, *infra*).

II. *The Scope of the FCC Orders*

Both the FCC's order in Docket No. 18920 (the *Specialized Common Carrier* Decision) and its order of October 4, 1973, require AT&T to "[honor] requests of specialized carriers for interconnection facilities required by such carriers to terminate *the services they are authorized by the Commission to furnish*." Since neither of these orders specifies the particular types of private line service for which plaintiffs seek interconnection, the central problem of this litigation has been determining

which services the specialized common carriers have been authorized to provide.

 Plaintiffs have offered the Court two easy ways of solving this problem, neither of which the Court can accept as conclusive. The first is the letter from Bernard Strassburg, Chief of the Common Carrier Bureau of the FCC, to Laurence Harris, Vice-President of MCI dated October 19, 1973 which specifies that interconnections for FX, CCSA, and interexchange were among those ordered by the FCC. Plaintiffs assert that Strassburg is authorized by the Commission's regulations to interpret the Commission's orders,[7] and that his interpretations are as binding as Commission orders.[8]

We cannot accept plaintiffs' contention. The Commission's regulations only permit Strassburg authority in the administration of the tariff regulations; in other words, Strassburg is authorized to modify the Commission's procedures for the filing and consideration of tariffs, but he is not granted authority to interpret any order relating to the substance of a tariff. This becomes especially clear when Strassburg's authority under § 0.297 is compared with his authority under § 0.295, which specifically permits him to "interpret and to act upon the administration of such regulations promulgated by the Commission pursuant to section 220 of the Communications Act, relating to accounts, records and memoranda to be kept by carriers subject to the jurisdiction of the Commission." It would be incongruous to imply the power to interpret Commission's orders relating to tariffs when the power to interpret orders is spelled out in a similar section.

However, 47 CFR § 0.91 empowers the Common Carrier Bureau to "advise [ ] and assist members of the public and the industries regulated on communications matters."[9]

Strassburg's letter seems to fit within the framework of this subsection. Strassburg's letter was "advice" to MCI and can likewise be taken by this Court as advice, from a knowledgeable if not an authoritative source, on the question of whether the requested interconnections were comprehended by the Commission's orders.

 The second piece of conclusive evidence which plaintiff seeks to offer on this question of whether the requested services are within the Commission's orders is the testimony of Kelley E. Griffith, Chief of the Domestic Rates Division of the FCC's Common Carrier Bureau. Mr. Griffith testified at the hearing on the preliminary injunction that the Commission had meant to include FX, CCSA, and interexchange in

7. Plaintiffs base this assertion on 47 CFR § 0.91, which states that:

"The Common Carrier Bureau [of the FCC] develops, recommends, and administers policies and programs with respect to the regulation of rates, services, accounting, and facilities of communications common carriers involving the use of wire, cable, radio and space satellites. The Bureau performs the following functions:

(a) Advises and makes recommendations to the Commission and represents the Commission in matters pertaining to common carrier regulation and licensing.

\*　　\*　　\*　　\*　　\*

(e) Advises and assists members of the public and the industries regulated on communication matters.

\*　　\*　　\*　　\*　　\*

(g) Exercises such authority as may be assigned or referred to it by the Commission pursuant to section 5(d) of the Communications Act of 1934, as amended."

They have also relied upon 47 CFR § 0.297, which specifically sets forth the authority of the Chief of the Common Carrier Bureau. Among his powers is the authority to: . . . "act upon all matters arising in connection with the administration of tariff regulations promulgated by the Commission pursuant to Section 203 of the Communications Act, and in connection with the administration of that section insofar as it relates to the modification of requirements thereof . . . and to the rejection of tariffs as authorized by subsection (d) thereof."

8. Plaintiffs read this power from 47 CFR 0.-203(b). However, this section only describes the scope of delegated authority, which authority must first be delegated by some other section.

9. See footnote 5, *supra.*

their orders in Docket No. 18920 and October 4. However, the Court cannot accept Griffith's conclusions concerning the orders because Griffith, like his superior, Strassburg, lacked authority to interpret them. Moreover, the Court feels that it cannot even take Griffith's testimony into account on an advisory basis, since Griffith's testimony was not general advice to the public but specifically designed to be introduced as expert opinion evidence in this Court. Defendant has cited several cases barring expert testimony on domestic law.[10] Although the Court finds these cases inopposite, because they were concerned that testimony as to domestic law would undermine the effect of the Judge's charge to the jury, the general principle enunciated by these cases—that a Judge is as much an expert on domestic law as any possible witness—is still valid. The testimony of an expert witness as to the FCC's laws and regulations should be rejected by a Court, not because such testimony is legally forbidden, but because reliance on it would reveal the limitation on the Court's competence and thus the need for preliminary referral of the case to the expert agency, in this case the FCC.

The elimination of the above two easy answers to the question of whether the types of interconnection MCI wants were among those the FCC ordered does not make the question of what services are included unanswerable. Although FX, CCSA, and interexchange were not mentioned by name in the comments submitted in Docket No. 18920, the manner in which the Commission discussed private line services and particular subgroups thereof leads to the conclusion that these services were included in the order in Docket No. 18920. The reasoning that leads to this conclusion is adequately discussed in the Findings of Fact, supra. Basically, the reasoning is as follows: Throughout its opinion in Docket No. 18920, the Commission rarely mentions particular kinds of inter-

state private line (voice) services. The Commission did mention wide area telephone service (WATS) and long-distance toll service, but only to exclude them from the scope of the decision. If FX, CCSA, and interchange were to have been excluded also, they would have been singled out as were WATS and private long-distance toll calls. But more conclusively, the Commission in their estimates of the effect of private line competition on AT&T's revenues, took into account all of AT&T's private line revenues (except for WATS and long-distance toll) and stated that even if AT&T lost all the private line market, its revenues would not shrink to the point where its ability to provide local exchange service would be jeopardized. Since the Commission was taking into account AT&T's revenues from all private line services, and since the Commission recognized the possibility that all these revenues might be diverted to AT&T's competitors, the Commission must have foreseen—and approved—competition in the provision of FX, CCSA, and interexchange services. And since these services were approved, the Commission's order that defendants interconnect to allow their competitors to provide private line service covers these kinds of services as well.

Defendants claim that the order in Docket No. 18920 does not embrace switched network communications, that is, calls that must go through a central switchboard on Bell's premises rather than from one private switchboard to another. To bolster this claim defendants point to a number of comments filed by MCI with the Commission in Docket No. 18920 which state that MCI does not intend to provide service that requires connection into a local exchange. Even assuming that MCI's comments did not cover the provision of FX, CCSA, or interexchange services, this would in no way limit the scope of the Commission's order in Docket No. 18920. That order states that it took

---

10. Huff v. United States, 273 F.2d 56 (5th Cir. 1959); Mack v. United States, 268 F.2d 931 (5th Cir. 1959).

into account competition with all the private line services which the Bell companies offered (except WATS and long-distance toll), and its decision was to permit competition in all private line services. MCI's authorizations subsequent to the decision in Docket No. 18920 are broad enough to permit it to provide these services.[11]

### III. The Legality of Defendants' actions under Section 202 of the Communications Act

■ In order to assert jurisdiction over this case, the Court would have to find that the defendants were discriminating against the plaintiffs in the provision or the terms of provision of services. The Court did so find, and asserted jurisdiction (see pp. 4–5, *supra*). However, this finding is not equivalent to a finding that defendants, as plaintiffs contend, violated § 202 of the Act, which prohibits a common carrier from making "any unjust or unreasonable discrimination in charges, practices, . . . or services . . . for or in connection with like communication service. . . ." This section, unlike the section vesting jurisdiction in the district courts to issue a mandatory injunction, prohibits only unjust or unreasonable discrimination. We feel that the reasonability of a difference in charge or service between customers is a question that the FCC rather is better qualified than is this Court to answer. Questions as to the justice and reasonability of discriminations, like questions as to the reasonability of tariffs, necessitate the marshalling of factual data and the weighing of factual data which is particularly within the competence of the Commission. Most of the cases which have been brought under this section have been appeals from FCC decisions enforcing the section, and these cases have stressed the discretion of the Commission in in-

terpreting and implementing the prohibitions of the section. See, e.g. Associated Press v. FCC, 146 U.S.App.D.C. 361, 452 F.2d 1290 (1971); American Trucking Associations, Inc. v. F.C.C., 126 U.S.App.D.C. 236, 377 F.2d 121, cert. denied 386 U.S. 943, 87 S.Ct. 973, 17 L.Ed.2d 874 (1966).

### IV. Exclusivity of FCC Jurisdiction over the Types of Interconnection Requested

■ In its order of October 4, 1973, the Commission, besides commanding defendants to interconnect with the specialized common carriers for the purpose of FX, CCSA, and interexchange services, also informed defendants that the Commission had jurisdiction over facilities necessary for the provision of interstate private line services, at least insofar as their interstate usage was concerned, and that the state utility commissions with which AT&T had shortly before filed tariffs covering certain interconnections lacked any jurisdiction over those interconnections. The Commission based this decision in part on its earlier decision in Dial Restoration Panel, 38 FCC 2d 803 (1973), in which it was held that even if facilities were used for both interstate and intrastate communications, tariffs regarding the interstate usage should be filed with the Commission. Subsequent to its receipt of the Commission's Order, and one day before the Court's hearing on this matter, AT&T filed with the FCC tariffs similar to the ones they filed with the state commissions, under protest. This protest was later transformed into an appeal of the Commission's October 4 Order.[12]

We agree with the Commission's interpretation of its own orders, and we find that these decisions are in line with the decisions of the Courts on the ambit

---

11. See Findings of Fact Nos. 65 and 66 for a description of the process by which plaintiffs were authorized to provide the services in question.

12. American Telephone and Telegraph Co. v. Federal Communications Commission and the United States, 487 F.2d 865 (2nd Cir. 1973).

of the FCC's jurisdiction. The Courts have held that transmission facilities located entirely within one state are not thereby immune from Commission regulation if those facilities are used in an interstate transmission network. United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968); Ward v. Northern Ohio Telephone Company, 300 F.2d 816 (6th Cir.), cert. denied, 371 U.S. 820, 83 S.Ct. 37, 9 L.Ed.2d 61 (1962); California Interstate Telephone Co. v. F. C. C., 117 U.S. App.D.C. 255, 328 F.2d 556 (1964). It has also been held that Commission regulation of interstate communications does not end with the local switchboard, but continues to the transmission's ultimate destination. United States v. American Telephone and Telegraph Co., 57 F.Supp. 451 (S.D.N.Y.1944), aff'd. sub nom. Hotel Astor, Inc. v. United States, 325 U.S. 837, 65 S.Ct. 1401, 89 L.Ed. 1964 (1945). And when a local transmission facility is included in an interstate transmission network, the regulation of the interstate uses of that facility lies exclusively with the FCC. Ivy Broadcasting Company v. AT&T, 391 F.2d 486 (2d Cir. 1968).

The above discussion does not mean that the tariffs filed by defendants which were approved by the Pennsylvania Utilities Commission on November 30, 1973 are invalid or without effect. It merely means that defendant Bell of Pa. may not further delay plaintiffs interconnections of the kinds requested in this suit on the grounds that tariffs governing such interconnections must be filed with the state regulatory commission, since, as explained above, the state body lacks jurisdiction over terms and conditions of such interconnections.

## ORDER

And now, to wit, this 31st day of December, 1973, the motion of plaintiffs in the above captioned matter for a preliminary injunction is hereby granted. Defendants The Bell Telephone Company of Pennsylvania and the American Telephone and Telegraph Company are ordered to provide to plaintiffs:

(a) Interstate "Foreign Exchange" service, comparable to AT&T's Series 2006-FX service offered under AT&T interstate Tariff 260, involving an MCI interstate circuit connected at MCI's local terminal to a business telephone arrangement supplied by defendant The Bell Telephone Company of Pennsylvania.

(b) Interstate services on a through basis utilizing local connecting facilities of The Bell Telephone Company of Pennsylvania to interconnect the local terminal facilities of MCI and one or more other specialized common carriers.

(c) Interstate private line services connecting common control switching arrangement (CCSA) facilities, involving connection of MCI's terminal to a CCSA facility supplied by The Bell Telephone Company of Pennsylvania, as is now done for AT&T when its Long Lines Department offers this service under AT&T's interstate Tariff 260.

(d) Interstate services terminating at the premises of plaintiffs' customers which are located in communities nearby to cities where MCI's terminals are situated, but outside the local service areas as defined by The Bell Telephone Company of Pennsylvania. These services require forms of interconnection regularly made available to Western Union and to AT&T's Long Lines Department, and include situations where part of the circuit to a remote customer's location is supplied by a second telephone company.

(e) Such other interconnection facilities as are necessary to enable plaintiffs to furnish the interstate services they are authorized by the FCC to perform.

Defendant American Telephone and Telegraph Company is ordered to vote its shares of stock in the various Bell

operating companies located throughout the United States in support of the provision to plaintiffs of the types of interconnection specified in the preceding five paragraphs.

None of this involves the provision of joint service, the division of charges therefor, or participation in any other joint or intra-corporate business relations between Long Lines and The Bell Telephone Company of Pennsylvania.

Interconnected facilities shall be of high quality and the reliability of service shall be no less than that provided for Long Lines, Western Union, or their customers.

Should any party raise with the Court a question concerning the proper compensation to be paid the defendants for the interconnection which they must provide to plaintiffs, the interconnection must nevertheless take place forthwith. The amount of compensation to be paid defendants for the interconnections that are the subject of this Order is a matter for determination by the Federal Communications Commission in a further proceeding.

The defendants' motion to dismiss is hereby denied.

And it is so ordered.