MICAL COMMUNICATIONS, INC.; Reflex Marketing, Inc.; Palace Communications, Inc., Plaintiffs–Appellants,

v.

SPRINT TELEMEDIA, INC., formerly known as Sprint Gateways, Inc.; United Telecommunications, Inc.; US Telecom, Inc., Defendants–Appellees.

No. 92–3096.

United States Court of Appeals, Tenth Circuit.

July 23, 1993.

Robert F. Brodegaard of Thacher Proffitt & Wood, New York City (Joel R. Dichter of Seham, Klein & Zelman, New York City and Robert F. Rowe, Jr., of McAnany, Van Cleave & Phillips, P.A., Lenexa, KS, with him on the briefs), for plaintiffs-appellants.

H. Richard Juhnke of Sprint Corp., Kansas City, MO (Stephen R. Tatum and Denise M. Anderson, Sprint Corp., Kansas City, MO, James R. Wyrsch, Keith E. Drill, and Melissa Farley Sebree of Wyrsch Atwell Mirakian Lee & Hobbs, P.C., Kansas City, MO, with him on the brief), for defendants-appellees.

Before SEYMOUR, MOORE, and ANDERSON, Circuit Judges.

STEPHEN H. ANDERSON, Circuit Judge.

Plaintiffs/Appellants Mical Communications, Inc., Reflex Marketing, Inc., and Palace Communications, Inc. (collectively "Mical") appeal from the denial of a motion for a preliminary injunction seeking to restrain defendants/appellees Sprint Telemedia, Inc. f/k/a/ Sprint Gateways, Inc., US Telecom, Inc. and United Telecommunications, Inc. (collectively "Sprint") from terminating the billing and collection service provided by Sprint in connection with Mical's area code 900 telephone information business. Specifically, Sprint terminated those services for the "romance talk" telephone lines operated by Mical. Mical claims that that termination was discriminatory and content-based, and therefore in violation of the Communications Act of 1934, 47 U.S.C. §§ 201 and 202.

The district court denied Mical's motion for a preliminary injunction, holding that Sprint's termination did not violate the Communications Act. We hold as follows: the particular language of the Communications

Act at issue is ambiguous and does not clearly resolve the question of whether Sprint's actions violated the Act; and, because this case involves questions clearly within the expertise of the Federal Communications Commission ("FCC"), and because the precise issue before us in this case is presently pending before the FCC, we conclude that the FCC must be allowed to resolve the issue initially under the doctrine of primary jurisdiction. We therefore reverse and remand to the district court.

## BACKGROUND

Sprint is a common carrier under the Communications Act, providing local and long distance service to the public. Since 1989, Sprint has offered area code 900 service to subscribers on a pay-per-call basis. Other common carriers such as AT & T and MCI provide the same type of area code 900 service.

The area code 900 service typically works as follows: Sprint and subscribers such as Mical enter into information provider agreements, pursuant to which Sprint assigns to the subscriber or information provider ("IP") a telephone number beginning with the area code 900. The IP advertises to the calling public the particular number and the type of information conveyed when a caller calls the number. Sprint transports calls from individuals to the IP, and is paid by the IP for the cost of the transmission of those calls.

Unlike an area code 800 service, however, which is free to the caller, the area code 900 service IP charges its callers for the information provided on a per-minute or per-call basis. The IP generates revenues by charging more for each call than the long distance carrier such as Sprint charges the IP to transmit those calls. The IP does not itself, however, typically bill and collect from the caller. Rather, Sprint and virtually all other area code 900 long distance carriers such as Sprint have performed that service on behalf of the IP. Thus, Sprint would bill individual callers for each such call placed, through the normal subscriber billing process of the caller's local telephone company.

The local telephone company would then remit to Sprint the revenues attributable to the IP's 900 telephone lines. Sprint would deduct the portion of those revenues attributable to its own services (transport, billing and collection) and remit to the IP the balance. Sprint's obligations under its information provider agreement with Mical were, therefore, to assign to Mical an area code 900 number, transport calls to that number, bill and collect for such calls and remit to Mical its portion of those collections, and handle customer inquiries concerning charges for those calls.

After entering into the information provider agreements with Sprint in 1989, Mical spent $50 million advertising and promoting its 900 lines. Apparently in response to consumer complaints about some of the 900 programs for which Sprint provided transmission, billing and collection services, in September, 1991, Sprint announced that it would cease providing the billing and collection service for most of its area code 900 subscribers, including Mical, although it would continue to provide transmission of area code 900 calls. In its press release dated September 24, 1991, announcing this change, Sprint stated:

> "We have thoroughly evaluated the status of the 900 market today and find that a number of services currently being offered put consumers at some risk. Consumers say they are often confused about what they are getting with these services. They sometimes misunderstand that using these programs will cost them, and they report they have not gotten good value for their money," said Adrian Toader, general manager for Sprint Telemedia. "The unfortunate part of this equation is that to insure we can get rid of the bad apples we've had to take the rather extreme action of backing away from better than 90 percent of the current marketplace."

> . . . . .

> "What this means," Toader explained, "is that we are essentially withdrawing from what currently constitutes the majority of this marketplace. We will continue to serve certain providers of quality pro-

grams such as news, stock quotes, sports information, and weather."

. . . . .

This puts the company in the extremely awkward position of being unable to legally deny service to anyone—regardless of the content of the message.... Denying associated billing operations appears to be the only legal recourse open to the company to discourage misuse of the company's network.

Appendix of Plaintiffs–Appellants at 66–69. In accordance with the terms of the IP agreements it had with Mical and other IPs, Sprint gave them 90 days' notice of discontinuance. Thus, Sprint ceased to provide billing and collection services for Mical's "romance" line area code 900 service. Other long distance carriers remained willing, apparently, to provide the billing and collection service as well as transmitting the calls, but the particular number following the area code 900, which callers had come to associate with Mical's information services, were not transferable to a different carrier. Transferring to a different carrier was therefore possible, but would have necessitated "reeducating" the calling public as to Mical's particular 900 phone numbers. Mical asserts that, "[t]he good will and customer base for which Appellant had spent $50 million and dedicated three years of labor to develop was lost." Brief of Plaintiffs–Appellants at 14.

Mical commenced this action against Sprint in the United States District Court for the Southern District of New York. The action was transferred to the district court in Kansas. The district court issued a temporary restraining order on January 16, 1992, enjoining Sprint from terminating its billing and collection service pending a preliminary injunction hearing. That hearing took place on January 27–29, 1992, and resulted in the denial of Mical's motion for a preliminary injunction on the grounds, *inter alia*, that Mical had "failed to show that they will suffer irreparable harm if the injunction is denied"; had "not met their burden to show that there is a likelihood of success on the merits of plaintiffs' claims"; and because "[t]he Communications Act of 1934 is not violated by defendants' withdrawal of billing and collection services to plaintiffs." Order, Appendix of Plaintiffs–Appellants at 294–97. Mical appeals only that portion of the order finding that the Communications Act was not violated by Sprint's actions. Notice of Appeal, *Id.* at 337.

## DISCUSSION

Section 202(a) of the Communications Act provides as follows:

It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

47 U.S.C. § 202(a). Mical argues that billing and collection services are "services ... in connection with" communication service, such that Sprint's selective termination of those services for some area code 900 subscribers but not for others amounts to prohibited discrimination. The district court held that they were not, stating "[s]uch services are not basic transmission services, are not regulated by the Federal Communications Commission and are not subject to the Communications Act." Order, Appendix of Plaintiffs–Appellants at 296–97.

Section 201 of the Act provides in pertinent part that "[i]t shall be the duty of every common carrier engaged in interstate ... communication by wire or radio to furnish such communication service upon reasonable request therefor...." 47 U.S.C. § 201(a). Mical also claims Sprint violated this section when it terminated its billing and collection services for Mical allegedly because of the content of the information provided to callers by Mical. Mical argues:

Sprint's practice of refusing to provide service for horoscope lines, romance lines, entertainment lines or any other types of lawful information services violates its duty

under Section 201 of the Act to render service to the public upon reasonable request. Sprint has not alleged that *any* of the services provided by Appellants are unlawful—the only proper reason under Section 201 for a content-based refusal to provide service.

Brief of Plaintiffs–Appellants at 31. Mical relies on 47 U.S.C. § 406 for its claim to injunctive relief.[1]

Sprint responds, first, that this court "lacks jurisdiction [over this case] because of the absence of a case or controversy," Appellant's Answering Brief at 2, because of Mical's failure to appeal the district court's finding that Mical would not suffer irreparable harm; and, second, that the district court properly held that Mical had failed to establish a likelihood of success on the merits and properly concluded that Sprint's actions did not violate the Communications Act.

█ We begin by rejecting Sprint's argument based on jurisdiction. Sprint argues that the existence of irreparable harm is an indispensable requirement for the issuance of a preliminary injunction, and even if Mical persuaded this court that it had a likelihood of success on the merits by showing that Sprint's actions violated the Communications Act, Mical's failure to appeal the finding of irreparable harm means that no preliminary injunction could issue. Therefore, the argument goes, we lack jurisdiction to hear the case.

Sprint confuses lack of jurisdiction with failure on the merits. Sprint is simply arguing that Mical has failed to establish that it is entitled to a preliminary injunction, and we should affirm the district court's refusal to issue one. Mical's timely filed appeal from that part of the district court's order finding that the Communications Act had not been violated and that no preliminary injunction should issue, however, conferred jurisdiction on this court. 28 U.S.C. § 1292(a)(1).

█ Moreover, we agree with Mical that irreparable harm need not be shown in this case. "When the evidence shows that the defendants are engaged in, or about to be engaged in, the act or practices prohibited by a statute which provides for injunctive relief to prevent such violations, irreparable harm to the plaintiffs need not be shown." *Atchison, Topeka and Santa Fe Ry. v. Lennen,* 640 F.2d 255, 259 (10th Cir.1981) (per curiam); *accord, CSX Transp. v. Board of Equalization,* 964 F.2d 548, 551 (6th Cir. 1992) ("since Congress has expressly authorized the granting of injunctive relief to halt or prevent a violation of [the Railroad Revitalization and Regulatory Reform Act of 1976] traditional equitable criteria do not govern the issuance of preliminary injunctions"); *Burlington Northern R.R. Co. v. Bair,* 957 F.2d 599, 601 (8th Cir.) ("It is a well-established rule that where Congress expressly provides for injunctive relief to prevent violations of a statute, a plaintiff does not need to demonstrate irreparable harm to secure an injunction."), *cert. denied,* —— U.S. ——, 113 S.Ct. 69, 121 L.Ed.2d 36 (1992); *Illinois Bell Tel. Co. v. Commerce Comm'n,* 740 F.2d 566, 571 (7th Cir.1984) ("[W]here the plaintiff seeks an injunction to prevent the violation of a statute that specifically provides for injunctive relief, it need not show irreparable harm.... This rule has been applied to private plaintiffs seeking an injunction under 47 U.S.C. § 401(b).") (citations omitted); *Gresham v. Windrush Partners, Ltd.,* 730 F.2d 1417, 1423 (11th Cir.) (" '[w]here ... an injunction is authorized by statute and the statutory conditions are satisfied ... the usual prerequisite of irreparable injury need not be established.' ") (quoting *United States v. Hayes Int'l Corp.,* 415 F.2d 1038, 1045 (5th Cir.

---

1. Section 406 provides in pertinent part:

 The district courts of the United States shall have jurisdiction upon the relation of any person alleging any violation, by a carrier subject to this chapter, of any of the provisions of this chapter which prevent the relator from receiving service in interstate or foreign communication by wire or radio ... from said carrier at the same charges, or upon terms or conditions as favorable as those given by said carrier for like communication or transmission under similar conditions to any other person, to issue a writ or writs of mandamus against said carrier commanding such carrier to furnish facilities for such communication or transmission to the party applying for the writ....

 47 U.S.C. § 406.

1969)), *cert. denied,* 469 U.S. 882, 105 S.Ct. 249, 83 L.Ed.2d 187 (1984).

■ 47 U.S.C. § 406 authorizes "district courts . . . upon the relation of any person alleging a violation, by a carrier subject to this chapter, of any of the provisions of this chapter which prevent the relator from receiving service in interstate . . . communication by wire . . . to issue a writ or writs of mandamus against said carrier commanding such carrier to furnish facilities for such communication . . . to the party applying for the writ. . . ." [2] Under the rule set forth in *Lennen* and the other cases cited above, Mical need not show irreparable harm. It need only show that the statutory conditions for the issuance of an injunction were met—in this case, a violation of the provisions of the Communications Act which prevents Mical from receiving services in interstate communication. 47 U.S.C. § 406.

■ However, since section 406 is a mandamus statute, the ordinary requirements for the issuance of an injunction do not necessarily apply either. While a motion for injunctive relief now takes the place of a prayer for mandamus, "it appears that the substantive rights of the parties are still governed by the principles which have formerly been applied in mandamus cases." *MCI Communications Corp. v. American Tel. & Tel. Co.,* 369 F.Supp. 1004, 1025 (E.D.Pa.1973), *vacated* pending FCC action, *MCI Communications Corp. v. American Tel. & Tel. Co.,* 496 F.2d 214 (3d Cir.1974); *see also Sanchez–Espinoza v. Reagan,* 770 F.2d 202, 207 n. 7 (D.C.Cir.1985). ˙ Thus, Sprint's "duties under the Act would have to

be clear and unequivocal" in order for a court to grant injunctive relief requiring the performance of those duties. *MCI Communications Corp.,* 369 F.Supp. at 1025. *See also* 12 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3134 at 203 (1973) ("The same principles that governed the former writ now govern attempts to secure similar relief by action or motion."). As this court has observed, "[f]or mandamus to issue, there must be a clear right to the relief sought, a plainly defined and peremptory duty . . . to do the action in question; and no other adequate remedy available." *Johnson v. Rogers,* 917 F.2d 1283, 1285 (10th Cir. 1990). The crucial question, therefore, is whether Sprint's denial of billing and collection services to Mical constitutes a violation of the Communications Act.

■ Mical's argument is fairly straightforward. Because historically area code 900 service has always been offered and provided as a bundled package of transmission service plus billing and collection by the common carrier, and because no other method of billing and collection has proved successful, billing and collections services are clearly and unambiguously services "in connection with" a communication service under the Communications Act. Section 152(b)(1) of the Act, which provides for an exemption from Federal Communications Commission ("FCC") jurisdiction for "services . . . in connection with intrastate communication service," has been interpreted expansively in a few cases, Mical asserts, and the identical language of section 202(a) should be interpreted equally expansively.[3]

**2.** Fed.R.Civ.P. 81(b) abolished writs of mandamus, and provided that relief formerly available by mandamus may now be obtained by "appropriate motion" such as a motion for injunctive relief.

Sprint argues that section 406 has no application to this case because that section permits injunctive relief only for denials of communication or transmission *service* and not for denials of services "in connection with" such communication or transmission functions. As Mical points out, that argument ignores the statutory definitions contained in the Act. 47 U.S.C. § 202(b) specifically provides that "services, whenever referred to in this chapter, include charges for, or services in connection with, the use of common carrier lines of communication." Furthermore,

section 153(a) defines "wire communication" or "communication by wire" to include "the transmission of . . . sounds of all kinds . . . including all instrumentalities, facilities, apparatus and services . . . incidental to such transmission." Thus, if the billing and collection services at issue in this case are services "in connection with" communication services, section 406 authorizes injunctive relief to obtain those services if the denial of those services is a violation of the Communications Act.

**3.** Sprint argues that the few cases upon which Mical relies in support of its argument are distinguishable. We agree. Both *California v. FCC,* 905 F.2d 1217 (9th Cir.1990) and *National Ass'n of Regulatory Util. Comm'rs v. FCC,* 880 F.2d 422

Sprint's response is also straightforward. It is clear that not *every* service provided by a common carrier in connection with its provision of telephone transmission is a service "in connection with" such transmission for Communications Act purposes. Thus, the fact that historically billing and collection have been provided by Sprint in connection with its transmission of area code 900 telephone calls does not compel the conclusion that such services are covered by the Communications Act. Sprint reasons that the exact meaning of the terms "services ... in connection with" communications services under the Act is obviously, therefore, ambiguous, and in the face of such ambiguity, deference to the agency charged with enforcing the Act—the FCC—is required and the FCC has held that such billing and collection services are "not subject to regulation under Title II of the Act."

Neither party suggests referring this matter to the FCC under the doctrine of primary jurisdiction. Neither party suggests that this court should await a decision of the FCC concerning the Public Notice released February 7, 1992, soliciting comments on the petition filed by Audio Communications, Inc. ("ACI") "requesting that the Commission issue a declaratory ruling on whether U.S. Sprint's guidelines for 900 service violate the Communications Act." *Pleading Cycle Established for Comments on Audio Communications, Inc. Petition for Declaratory Ruling on 900 Service Guidelines of U.S. Sprint Communications Co.,* 7 FCC Rcd 1443, 1992 FCC LEXIS 728 (Feb. 7, 1992). The ACI petition has raised the identical argument which Mical raises here: "ACI argues that U.S. Sprint employs discriminatory practices in selecting the information providers to which U.S. Sprint will provide premium 900 services. ACE describes premium 900 service as a bundled package that includes billing and collection as well as transport services." *Id.*[4]

(D.C.Cir.1989) involved the scope of 47 U.S.C. § 152(b)(1) of Title I of the Communications Act, not Title II, 47 U.S.C. §§ 201–222. In particular, both involved the issue of whether the FCC could preempt state regulation of a particular *intrastate* service where it had held that *interstate* provision of the service was beyond the scope of Title II of the Act. Mical argues that language in section 152(b)(1) (prohibiting FCC regulation of "services ... in connection with intrastate communication service") identical to the language of section 202(b) at issue in this case (prohibiting discrimination in "services ... in connection with" common carrier service) has been construed broadly to include "non-common carrier services." Brief of Plaintiffs–Appellants at 25. Thus, Mical argues, the principle of parallel statutory construction requires that the broad reading of the "in connection with" language of section 152(b) be equally applied to section 202. We disagree. As the court acknowledged in *California v. FCC,* "[s]ection 2(b)(1) [47 U.S.C. § 152(b)(1)] is phrased in broad terms that sweep beyond Title II." 905 F.2d at 1240–41 n. 35. The particular statutory language cannot be read out of its context within that broadly worded provision. The identity of language between section 152(b)(1) and section 202(a) does not necessarily mean that the scope of each should be identical.

Moreover, while *McDonnell Douglas Corp. v. General Tel. Co.,* 594 F.2d 720 (9th Cir.), *cert. denied,* 444 U.S. 839, 100 S.Ct. 77, 62 L.Ed.2d 50 (1979), upon which Mical also relies, does note that the language of section 202 and 152 is "virtually identical," its observations must be read in context. The billing and collection practices at issue in that case were collections from the telephone company's customers for taxes applicable to services it provided. The court appears to assume, although it does not so hold, that those collection practices would be subject to section 202 (Title II). It then goes on to observe that "[i]f, as McDonnell contends, General Telephone's tax collection practices were in violation of § 202 because they constituted 'charges, practices, ... regulations, ... or services' relating to communications, then it would be inconsistent to argue that those same tax collection practices are not 'charges, ... practices, services, ... or regulations' relating to intrastate communications services [under section 152(b)(1)]." *Id.* at 724. Thus, the court says that if section 202 covers the particular service, then section 152(b)(1) probably does also, and McDonnell's position is internally inconsistent. We do not read that opinion, however, to hold that services encompassed by section 152(b)(1)'s intrastate exemption *always* are equally subject to section 202's antidiscrimination provision.

Finally, none of these cases resolve the *precise* issue here—whether Sprint's billing and collection service for its 900 area code customers is a service in connection with a communication service under section 202.

4. ACI also argued to the FCC that "the detariffing of billing and collection does not relieve U.S. Sprint of its obligation to provide premium 900 service on a nondiscriminatory basis ... [and] suggests that the Commission reevaluate its 1986 order detariffing billing and collection in light of the development of 900 services." *Pleading Cycle,* 1992 FCC LEXIS at *2. The 1986 Order referred to involved the issue of whether the

We agree with Sprint that the precise meaning of the statutory language here— "services ... in connection with" communication service—is unclear, and there is no indication in the statute whether billing and collection services provided by a common carrier in connection with its transmission of area code 900 telephone calls falls within that statutory language. And the fact that historically such billing and collection services have been provided along with the transmission of area code 900 calls, or even that customers have come to expect that such billing and collection will be performed by a carrier such as Sprint, or that other collection methods have proved less successful, does not necessarily compel the legal conclusion that those services are encompassed by the Communications Act.

■ Because the statute does not clearly resolve the issue before us, we must determine whether we or the FCC is the appropriate entity to make that resolution initially. Despite the fact that both parties have argued that there is no need to refer this matter to the FCC, we conclude that the district court should have stayed the matter pending the FCC's action on the ACI petition before it.

"Primary jurisdiction is invoked in situations where the courts have jurisdiction over the claim from the very outset but it is likely that the case will require resolution of issues which, under a regulatory scheme, have been placed in the hands of an administrative body." *Marshall v. El Paso Natural Gas Co.*, 874 F.2d 1373, 1376 (10th Cir.1989). Under that doctrine, "the judicial process is suspended pending referral of the issues to the administrative body for its views." *Id.* at 1377; *see also Association for Retarded Citizens v. New Mexico*, 678 F.2d 847, 850 (10th Cir.1982). We have noted the factors relevant to application of the doctrine as follows: whether the issues of fact raised in the case are not within the conventional expe-

rience of judges; or whether the issues of fact require the exercise of administrative discretion, or require uniformity and consistency in the regulation of the business entrusted to a particular agency.

*Marshall*, 874 F.2d at 1377 (citing *Far East Conference v. United States*, 342 U.S. 570, 574–75, 72 S.Ct. 492, 494–95, 96 L.Ed. 576 (1952)). Other courts have approved consideration of similar factors:

We have said that a district court in its discretion should invoke primary jurisdiction and defer only if the benefits of obtaining the agency's aid outweigh the need to resolve the litigation expeditiously. The district court may consider many factors in striking this balance, including: how agency action will aid the litigation; whether the litigation involves conduct requiring continuing supervision by the agency; whether the issues to be litigated are unique to regulated industries; and whether proceedings already are pending before the agency.

*Gulf States Utils. Co. v. Alabama Power Co.*, 824 F.2d 1465, 1473 (5th Cir.1987) (citation omitted).

This court in *Marshall* specifically considered, *inter alia*, whether "the potential for inconsistent orders [by the district court and the agency] was so likely that the district court abused its discretion in refusing to refer this case to the [agency] under primary jurisdiction." *Marshall*, 874 F.2d at 1379.

Mical makes slightly different arguments to support its assertion that referral of this matter to the FCC would be futile. In its briefs, it argues that the FCC has issued several orders and rulings on the general topic of third party billing and collection, all of which have held that such billing and collection is *not* subject to Title II of the Communications Act, but all of which involve a different type of billing and collection from the billing and collection at issue here.

---

billing and collection service "provided by a local exchange carrier (LEC) to an interexchange carrier (IC) whereby the former bills and collects from end users for services provided to end users by the IC" is within the scope of Title II. *In the Matter of Detariffing of Billing and Collection Services*, 102 F.C.C.2d 1150 (available on WEST-

LAW, FCOM–FCC database), 1986 FCC LEXIS 4059 at \*2 n. 2 (January 29, 1986). The Commission determined that such service was " 'not communications common carriage within' Title II of the Communications Act." *Id.* at \*1. *See also Public Serv. Comm'n v. FCC*, 909 F.2d 1510, 1512 (D.C.Cir.1990) (discussing 1986 Order).

Thus, Mical argues that the billing and collection services at issue in the 1986 Detariffing Order, as well as in subsequent rulings which rely on the 1986 Order, were different in crucial ways from the billing and collection services at issue in this case, so that those orders and rulings have no bearing on this case.[5]

At oral argument of this case, however, Mical appeared to concede that the FCC has ruled adversely to it, but erroneously, on the very issue before us, and therefore referral to the agency would be pointless.

Sprint, on the other hand, contends that the statute's ambiguity dictates deference to the FCC, and the FCC has clearly ruled in its favor, so we need not seek the FCC's expertise to resolve this issue. The FCC ruling upon which Sprint places greatest reliance is an interpretive ruling issued by the Common Carrier Bureau, acting under authority delegated to it by the FCC, in which it concluded that AT & T's "Premium Billing" service, pursuant to which AT & T would bill and collect on behalf of certain subscribers to its area code 900 "Dial-It" services, "is not a Title II common carrier service, is subject to current and foreseeable competition and, as a result, is properly offered by AT & T on a non-tariffed basis." *In the Matter of AT & T 900 Dial–It Service and Third Party Billing and Collection Service*, 4 FCC Rcd 3429 (available on WESTLAW, FCOM–FCC database), 1989 FCC LEXIS 911 (April 12, 1989).[6]

The FCC has more recently reiterated that billing and collection "remains outside the scope of Title II because it is not a common carrier service." *In the Matter of Policies and Rules Concerning Local Exchange Carrier Validation and Billing Information for Joint Use Calling Cards*, 7 FCC Rcd 3528 (available on WESTLAW FCOM–FCC database), 1992 FCC LEXIS 2511 at *23 (May 8, 1992). The Commission appeared in that order, however, to retreat from its characterization of billing and collection by LECs as merely a "financial and administrative" service. *See note 5, supra.*

Obviously, considered broadly, this case involves the sort of statutory interpretation in which courts regularly engage. We must simply determine whether the billing and collection service at issue is a service "in connection with" transmission service under the Communications Act. But, considered more specifically, this case involves the appropriate characterization of a specific and

---

5. Mical characterizes the 1986 Order as addressing "stand-alone" billing and collection services, where the LEC bills and collects solely on behalf of another entity—i.e. the IC. This case, Mical argues, involves billing and collection in connection with Sprint's provision of transmission service. Mical relies on the Detariffing Order's observation that "carrier billing and collection for a communication service that it offers individually or as a joint offering with other carriers is an incidental part of a communication service." *Detariffing Order*, 1986 FCC LEXIS at *35–36. Mical argues, "[i]t is only when the carrier does not condition availability of billing services on subscription to the telecommunication services that the stand-alone billing offered does not fall within the Act." Reply Brief of Plaintiffs–Appellants at 17.

It is clear that the particular billing and collection services involved in that Order *were* different from the ones at issue here. However, the Order specifically stated, "carrier billing or collection for the offering of another unaffiliated carrier is not a communication service for purposes of Title II of the Communications Act." *Detariffing Order*, 1986 FCC LEXIS at *36. The Order goes on to characterize billing and collection as "a financial and administrative service," encom- passing "the recording and aggregation of the billing data corresponding to a completed telephone call, the application of the [interexchange carrier's] rates to those calls in order to create a customer invoice, the mailing of bills, the collection of customer deposits and bill payments, the handling of customer inquiries concerning their bill, and the investigation of customer fraud or billing evasion activities." *Id.* at *36. In discussing whether LEC billing and collection was subject to Title I of the Communications Act, which is not at issue in this case, the Commission observed that "there is sufficient competition to allow market forces to respond to excessive rates or unreasonable billing and collection practices." *Id.* at *39.

6. Mical argues that this ruling is simply wrong, and is based on a misinterpretation of the 1986 Detariffing Order. It also suggests that the *AT & T 900 Dial–It* ruling was factually distinguishable from the situation here, in that the Bureau's "finding was itself premised upon the condition that AT & T offer billing services through a separate contract and not as a part of its tariffed transmission offering. Here, in contrast, Sprint offered transmission and billing through a single IP Agreement." Reply Brief of Plaintiffs–Appellants at 19 n. 20.

relatively new service, in a rapidly changing industry, which has already been the subject of a number of orders and rulings by the FCC, none of which appears to address the *precise* issue here. And, that precise issue is pending before the FCC now. There is therefore a real possibility that a decision by this court prior to the FCC's response to the ACI petition would result in conflicting decisions, either between our court and the FCC or our court and another circuit if the FCC ruling is appealed.

Furthermore, it appears to us that the appropriate characterization of billing and collection in the area code 900 context requires expertise and a familiarity with the industry.[7] For those reasons, we conclude that the only prudent course is to REMAND this case to the district court with instructions that it stay the matter pending the issuance of a dispositive ruling by the FCC, whether by application by the parties in this case or otherwise. *See MCI Communications Corp. v. American Tel. & Tel. Co.,* 496 F.2d 214 (3rd Cir.1974); *see also Allnet Communications Serv. v. NECA,* 965 F.2d 1118, 1123 (D.C.Cir.1992).

---

7. For example, one of the issues which has relevance to this case, and about which both parties express widely differing views, is the viability of alternative billing and collection services for area code 900–type services. The record in this case is simply inadequate to resolve that issue. The various orders and rulings by the FCC, however, indicate considerable familiarity with that issue.

Furthermore, to underscore the rapidity with which changes are occurring in the area code 900 arena, we note that the Telephone Disclosure and Dispute Resolution Act ("TDDRA") was recently enacted, which is designed to "protect the public interest and the future development of pay-per-call technology by providing for the regulation and oversight of the applications and growth of the pay-per-call industry." TDDRA,

Pub.L. No. 102–556, 106 Stat. 4181 (preamble). TDDRA requires, among other things, both the FCC and the Federal Trade Commission to adopt regulations and make recommendations to Congress regarding interstate pay-per-call services. In a recently released notice, the FCC indicated that it was seeking comment on, inter alia, whether there should be "a prohibition against carrier billing for any interstate collect calls that offer or initiate audiotext or simultaneous voice conversation programs, and whether such a prohibition is technically feasible." *In the Matter of Policies and Rules Implementing the Telephone Disclosure and Dispute Resolution Act,* 8 FCC Rcd 2331 (available on WESTLAW FCOM–FCC database) 1993 FCC LEXIS 1562 (March 10, 1993).