The BELLINGRATH–MORSE FOUNDATION: Palomar Insurance Corp.: Alabama Food Services, Inc., and Gulf City Body & Trailer Works, Inc., on behalf of themselves and all others similarly situated, Plaintiffs,

v.

BELLSOUTH TELECOMMUNICATIONS, INC., and South Central Bell Telephone Company, Defendants.

Civ. A. No. 95–0335–B–C.

United States District Court, S.D. Alabama, Southern Division.

May 5, 1995.

A. Clay Rankin, III, Henry A. Callaway, III, Mobile, AL, for plaintiffs.

Frederick G. Helmsing, Champ Lyons, Jr., Mobile, AL, for defendants.

### OPINION AND ORDER

BUTLER, Chief Judge.

On May 1–3, 1995, this Court held a hearing on plaintiffs' motion for a preliminary injunction. After considering the evidence presented, the argument of counsel and the applicable law, the Court concludes that the motion is due to be DENIED for reasons set forth in the following findings of fact and conclusions of law.

### Findings of Fact

On January 15, 1995, a new area code went into effect for the southern half of Alabama. Currently, callers may reach persons in the new area code through direct (1+) dialing either the new area code (1+334) or the old

area code (1+205). However, this dual access is set to expire on May 13, 1995, after which callers must use the 334 area code. Plaintiffs are business customers of defendant BellSouth Telecommunications, known in Alabama as South Central Bell[1], who seek to enjoin the cut-off of the old area code.

Since 1947, the telephone numbering system has been governed by the North American Numbering Plan (NANP). Until 1984 the NANP was administered by AT & T which held a virtual monopoly on telephone service within the United States—including local service, equipment sales and rental and long distance service. Upon the divestiture of AT & T in 1984, seven regional corporations, including BellSouth, were set up to provide local telephone service. A part of the divestiture, a new corporation known as Bellcore, was created to administer the NANP. Bellcore is owned by the seven regional Bell corporations. Each regional Bell is responsible for assigning prefix codes within its region.

When the NANP was devised, all area codes were assigned a center digit of "0" or "1". The reason for this was to allow the mechanical switching systems in use at that time to be able to distinguish between an area code and a prefix code, which is the first three digits of a local telephone number. Prefix codes were assigned a center digit of "2" through "9". At the time the NANP was developed, there were 160 possible area codes, 87 of which were assigned at the time with the remainder left available for growth. As of 1995, all 160 area codes have been used, but the need for new area codes continues to grow at a rapid pace.[2]

In Alabama, the exhaustion of the area codes coincides with the exhaustion of available telephone prefixes within the 205 area code. BellSouth anticipated the exhaustion of prefixes as early as 1988 and petitioned Bellcore for a new area code. Instead, Bellcore required that Alabama first adopt interchangeable prefix codes, that is, prefix codes that have a "0" and "1" for a center digit. In July 1993, BellSouth realized that the additional prefix codes were about to be exhausted and notified Bellcore that it had done all it could to preserve the 205 area code. Thus, south Alabama received the dubious distinction of becoming one of the first areas in the United States to receive an interchangeable area code.[3]

The problem of area code exhaustion had been anticipated by Bellcore for some time. Bellcore's solution was to switch to interchangeable area codes, that is, area codes with any number "0" through "9" as the center digit. In 1984, Bellcore began advising the telecommunications industry of the plan to implement interchangeable area codes. The projected date for the implementation at that time was July 1995. In 1991 Bellcore realized that existing area codes were going to be exhausted sooner than anticipated and, as a result, moved the implementation date up to January 1995.

Because the equipment owned by the telephone and other telecommunications companies was not programmed to recognize interchangeable area codes, the implementation of Bellcore's plan required extensive changes on the part of the telecommunications industry. The change required that all telephone equipment which contained a switch be modified so that the equipment could recognize interchangeable area codes. This includes equipment owned by the regional Bells, by the approximately 1300 independent tele-

1. Plaintiffs have named BellSouth Telecommunications, Inc. and South Central Bell as defendants. Because South Central Bell is merely the name under which BellSouth does business in Alabama, there is in actuality only one defendant, BellSouth. Consequently, the Court will refer to BellSouth as the defendant throughout the order.

2. This expanding need for new area codes is, in large part, attributable to the information age which has resulted in a rising number of fax machines, computer modems, cellular telephones and pagers, all of which require a telephone number.

3. Several other states are scheduled to receive interchangeable area codes within the next year. These include Illinois, Washington, Texas, Arizona, Colorado, Florida, Virginia, California and Tennessee. Washington's new area code also became effective on January 15, 1995; however, for reasons discussed more fully *infra* at n. 8, the discontinuance of the old area code has been postponed from May 21, 1995, to August 10, 1995.

phone companies within the United States and by overseas telephone companies. In addition, many of the telephone systems found in businesses and government offices, known as private business exchange ("PBX") systems, were incompatible with the interchangeable area code format.

Since Bellcore's 1984 decision to adopt interchangeable area codes, a massive effort has been underway throughout the country to prepare the telecommunications industry for the change. According to Ron Conners, administrator of the NANP for Bellcore, in 1984 Bellcore sent a major advisory letter to virtually everyone in the telecommunications industry advising them of the decision to implement the interchangeable area code format in 1995. The purpose of allowing such a long lead-time for implementation was to allow the industry ample time to convert equipment and switches so that these would be compatible with the new format. In 1988, Bellcore sent a series of letters to hardware vendors and manufacturers asking for their evaluation of the impact of the area code change. In 1991, Bellcore, through its *Digest of Technical Information,* informed members of the telecommunications industry that the supply of area codes was being exhausted more rapidly than anticipated and invited comments about the possibility of an earlier implementation date for interchangeable area codes.

Also in 1991, Bellcore enlisted the aid of the North American Telecommunications Association which represents PBX vendors to advise its membership regarding interchangeable area codes. In addition, in 1992 the United States Telephone Association, which represents the 1300 independent telephone companies in the United States, published a bulletin to update local exchange carriers on the switch capabilities required to implement the interchangeable area code format. Since 1984 there has also been an ongoing dialogue in trade publications and national telecommunications conferences on the proposed area code changes.

In addition, there have been extensive efforts to prepare the public for the change. Beginning in 1993 the defendant began a public relations campaign to inform the public about the area code changes. In 1993 and 1994, there were numerous press releases, customer bill inserts, articles in news bulletins and letters sent to business customers advising them of the upcoming area code changes and of the need to reprogram PBX systems to handle the new area codes. In a bimonthly bulletin sent several times in 1994 to business customers throughout the nine-state region served by defendant[4], PBX owners are warned that "[w]henever new codes are introduced, most business telephone systems must be upgraded to allow calls to be placed to the newly established numbers" and that it is their responsibility to make the necessary changes. Deft. Ex. 2–F.

In a 7–page brochure sent to business customers in the state of Alabama in September 1994 entitled "Alabama's New Area Code!", defendant devoted an entire page to PBX users. Underneath the captions "Attention PBX Users!" and "334: A New Kind of Area Code", the brochure explains the significance of the new area code and states: **"[I]f your business has a PBX system,** you may need to have it programmed to recognize the new area code format, and to recognize the new 334 area code itself. **Please consult your PBX vendor to determine the necessary changes."** Deft. Ex. 2–I. A packet of information delivered to large business customers throughout the state prior to the implementation of the 334 area code contained a sample employee letter which advises that reprogramming PBX equipment with the 334 area code is "essential for everyone who makes long distance calls into the new 334 area code[.]" Deft. Ex. 2–J.

On April 7, 1995, defendant sent a letter to business customers within the 334 area advising them to remind those with whom they do business to reprogram modems, automatic dialers and PBX equipment to recognize the 334 area code. That letter also contained a sample letter to customers.

---

4. BellSouth covers all or part of Louisiana, Mississippi, Alabama, Florida, Georgia, South Carolina, North Carolina, Tennessee and Kentucky.

There was also evidence that PBX owners outside the BellSouth region were being informed of the need to adapt their equipment to the new area codes. Specifically, defendant presented mailings to the business customers of Southwest Bell and U.S. West explaining the need to upgrade equipment to handle the area code changes. In addition, since 1993 at least two PBX vendors, Northern Telecomm and BellSouth, have been engaged in extensive marketing and customer education regarding the need for owners of existing PBX systems to update their equipment to handle interchangeable area codes.

After the change went into effect, customers in south Alabama began to experience difficulty receiving telephone calls from outside the 334 area code. Several business representatives testified that callers had been unable to reach them dialing the 334 area code and had only been able to get through using the 205 area code. According to these witnesses, this has caused a major disruption in their businesses and, in many cases, a substantial loss of business. It appears that the root of the problem in most cases is that the caller's PBX system has not been modified to recognize the 334 area code. In addition, there have been some problems receiving international calls which may be due to failure of international telephone companies to make the necessary changes. This problem is manifested in voice communication as well as facsimile transmissions.

Each business representative testified that he or she could not quantify the amount of loss caused by the area code problems because there was no way of knowing how many callers had been unable to get through. All of these witnesses testified that they were aware of the area code change prior to its implementation and that they had made some preparations by informing their customers of the new area code. Most had also had their own PBX systems upgraded to accommodate the new area codes.

Some were also implementing or considering implementing alternatives to insure that customers could reach them if the they were unable to dial 334 directly. For example, a caller whose PBX system did not recognize the 334 area code could still complete the call by dialing "0" and using an operator to complete the call. Another solution would be for businesses within the 334 area code to install an 800 number or to publicize an existing 800 number for incoming calls. Alternatively, a business could subscribe to a number within the 205 area code which could be forwarded to ring into an office in the 334 area.

## Conclusions of Law

### A. Statutory Relief

Plaintiffs contend that there are two available avenues for preliminary injunctive relief. First, they argue that they are entitled to relief pursuant to 47 U.S.C. § 406 which provides for the issuance of a writ of mandamus upon proof that the defendant has violated one or more of the provisions of the Communications Act of 1934, 47 U.S.C. §§ 201 et seq. The requirements for preliminary injunctive relief under § 406 are different from those necessary to obtain a preliminary injunction. It is true, as plaintiffs point out, that irreparable injury is not a prerequisite to relief under § 406. *Mical Communications, Inc. v. Sprint Telemedia, Inc.*, 1 F.3d 1031, 1036 (10 Cir.1993). However, because the statutory relief is in the nature of a mandamus, plaintiffs must prove that the defendant "clearly and unequivocally" violated the Act. *Id.*

In this case, plaintiffs allege that the defendants' practices in implementing the area code change are "unjust and unreasonable" in violation of 47 U.S.C. § 201, which provides that "[a]ll charges, practices, classifications, and regulations for and in connection with [telecommunications] service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful[.]" 47 U.S.C. § 201(b). The same issue—the reasonableness of defendants' implementation of the new area code—are raised in plaintiff's common law claims. For the reasons discussed more fully below, the Court finds that the plaintiffs do not have a substantial likelihood of success on the merits of this issue. Consequently, plaintiffs have failed to prove clearly and unequivocally that the defendant has violated the Act.

### B. Preliminary Injunction

A preliminary injunction "is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion." *Canal Auth. of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir.1974); *see also Nnadi v. Richter*, 976 F.2d 682, 690 (11th Cir.1992). The Court may grant a preliminary injunction only if the plaintiff clearly establishes each of the following:

> (1) a substantial likelihood that [it] will ultimately prevail on the merits; (2) a showing that [it] will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest.

*Cunningham v. Adams*, 808 F.2d 815, 819 (11th Cir.1987).

### 1. Success on the Merits

Plaintiffs have asserted essentially three common law claims against the defendants—negligence, breach of implied contract and fraud. Without delving into the merits of each of these claims individually (and some may be less viable than others) the crux of each is that defendant knew or should have anticipated the failure of PBX owners and independent and foreign telephone companies to update their equipment and that such failure would result in substantial disruption of telephone service in the 334 area code. Plaintiffs argue that defendants should have warned them of this potential problem and should have made them aware of alternatives that could be used to minimize the disruption in service, such as the use of "0" dialing and subscription to 205 and 800 numbers.

The issue now before the Court is whether there is a substantial likelihood that plaintiffs can prove that defendant's actions in implementing the new area codes were unreasonable. Of course, the reasonableness of defendant's actions must be considered in light of the facts known to it at the time. Defendant's obligation to warn south Alabama about the potential problems they might have in receiving calls presupposes that defendant should have anticipated the magnitude of the problem asserted by plaintiffs, *i.e.*, that substantial numbers of business calls cannot be completed because either PBX systems or telephone switching equipment owned by companies other than the regional Bells have not been upgraded to handle interchangeable area codes.

The evidence shows that since 1984 there have been extensive efforts to inform those who manufacture or sell telecommunications equipment and those who provide telecommunications services throughout the United States of the plan to switch to interchangeable area codes in 1995. Furthermore, there is evidence that at least some PBX vendors and other regional Bells have undertaken to notify PBX owners of the need to update equipment. Most importantly, the defendant itself has undertaken an extensive campaign to notify PBX users of the need to upgrade their equipment in order to place calls to the new area codes. In light of these industry-wide efforts, the Court does not find it likely that the defendant acted unreasonably or unjustly in failing to anticipate a substantial problem in receiving calls in the 334 area code.

Furthermore, the reasonableness of defendant's actions must be considered in light of the information defendant had already given plaintiffs. Plaintiffs were informed that they must upgrade their PBX systems in order to place calls to the 334 area code and that they should inform those with whom they do business of their new area code. Plaintiffs argue that they were thus led to believe that there would be no disruption to their long distance service so long as they took these actions. Plaintiffs' argument is both unpersuasive and counterintuitive. Logic dictates that if they could not place calls to other areas within the 334 area code without upgrading their systems, then other customers, both inside and outside the area code, could not do so either.[5]

---

5. In fact, one of plaintiffs' witnesses admitted that he knew those outside south Alabama would also have to upgrade their equipment in order to call the 334 area code. Mel Odle, Telecommunications Manager at Quality Micro Systems testified that he took the steps that needed to be

Finally, the Court considers the course of action that plaintiffs contend would have been reasonable. Plaintiffs argue that defendant should have (1) warned its business customers that they might not receive calls from outside the 334 area because some PBX owners might choose not to upgrade their equipment and (2) offered alternatives that would allow callers to get through such as operated-assisted calls, 800 numbers and call-forwarding from a 205 number. This is tantamount to telling defendant's customers that PBX upgrades may also be optional for them because there are other options available.

## 2. Irreparable Injury

With regard to the element of irreparable injury, the Eleventh Circuit has stated:

The injury must be neither remote nor speculative, but actual and imminent. An injury is irreparable only if it cannot be undone through monetary remedies. The key work in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Northeastern Florida Chapter of the Ass'n of Gen. Contractors of America v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir.1990) (quotations and citations omitted), *rev'd on other grounds,* — U.S. —, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993).

Applying these standards, the Court finds that plaintiffs have failed to prove that they will suffer irreparable injury if relief is not granted.[6] First, there are adequate alternative methods through which plaintiffs may continue to receive long distance calls from

callers whose PBX systems have not been upgraded. More importantly, the injury asserted by each of the business representatives is lost business revenue which is capable of ascertainment.

### 3. Balance of Harms

Without question, the new area code has caused and, in all likelihood, will continue to cause difficulties for plaintiffs, although the magnitude of the problem is difficult to determine at this time. Because some of the plaintiffs are small businesses, a decrease in business because of disruption in telephone service could have serious consequences. On the other hand the telephone company has not demonstrated that it will suffer any substantial injury or harm if the injunction is issued. The amount of effort it would take the defendant to maintain the dual access area codes in its region is relatively small. Although there was evidence that other South Central Bell customers might incur damages if the implementation of mandatory 334 area code was postponed, such evidence is not proof of any injury to the defendant. Thus, the Court finds that the balance of harms favors the plaintiffs.

### 4. Public Interest

An injunction, however, would not serve the public interest in this instance for several reasons. First, there is no question that new area codes are needed in Alabama and elsewhere. Unless the new area code is implemented there will be people and businesses throughout the state who will be unable to obtain telephone service. Second, an injunction would result in piecemeal interference with a comprehensive scheme to redesign the area code system which has been in underway for more than ten years. Importantly,

---

made to prepare his company for the area code change and assumed that other companies throughout the country would do the same.

**6.** Intervenor Boyd Reeves did allege irreparable injury in his petition to intervene. Mr. Reeves, a heart transplant candidate, alleged that the Oschner Clinic in New Orleans, Louisiana, where he expects to undergo transplant surgery, had been unable to reach his pager by dialing the 334 area code. Because time is of the essence in a

transplant situation, Oschner's ability to reach Mr. Reeves is critical. However, defendant has submitted a declaration from Oschner's director of telecommunications who states that the Clinic's telecommunications will be upgraded by May 13, 1995, to recognize the 334 area code and that until such time they can reach the 334 area code by using operator assistance. In light of this declaration, Mr. Reeves, through defense counsel, has withdrawn his petition to intervene.

that plan is a part of the NANP which has been coordinating the telephone numbering system throughout the United States and elsewhere almost fifty years. Third, many more area code changes are scheduled within the next year.[7] While plaintiffs cite this as a reason for delay, *i.e.*, why should we be first, the reality is that someone has to.[8] Although the Court also would like to spare plaintiffs, and the rest of south Alabama, the headaches that come with being first in this instance, such an attitude does take into account the public interest as a whole. Moreover, if courts in every jurisdiction affected by new area codes decided to wait for everyone else, there could be a "foot-dragging" competition of major proportions. This Court will not set the stage for such an eventuality.

## C. Conclusion

Change of any magnitude works a hardship on those affected, and virtually everyone in south Alabama is affected to some degree by the area code change. While delaying the inevitable change would probably ease the short-term transition for some, a court-ordered delay is not appropriate in this instance. The Court is not convinced that plaintiffs have a substantial likelihood of succeeding on the merits of their claims or that their injury can be classified as irreparable. Moreover, the public interest is not served by this Court's piecemeal interference in a comprehensive telephone-numbering plan that has both national and international ramifications. Accordingly, it is **ORDERED** that the motion for preliminary injunction be and hereby is **DENIED**.

**DONE.**

---

**7.** *See* n. 3, *supra.*

**8.** It should be noted that in delaying the discontinuation of dual access dialing in Washington for a period of 90 days, the only issue before the Washington Utilities and Transportation Commission was whether there was an immediate threat of substantial harm to the public health, safety or welfare. *See Washington Utilities and Trans. Bd. v. U.S. West Communications, Inc.*, Docket No. UT 950446 (Apr. 28, 1995).